UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Brian R. Martinotti, U.S.D.J. |
| | : | |
| v. | : | |
| | : | Crim. No. 22-818 (BRM) |
| ABID SYED | : | |
| TARIQ DIN | : | |
| MUHAMMED AURANGZEB | : | |

---

## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PRE-TRIAL MOTIONS

---

PHILIP R. SELLINGER
United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:
DeNae M. Thomas
Jessica R. Ecker
Assistant United States Attorneys

## **TABLE OF CONTENTS**

INTRODUCTION & BACKGROUND............................................................XVII

SUMMARY OF DEFENDANTS' PRE-TRIAL MOTIONS....... **.............................1**

ARGUMENT ...................................................................................... 4

I. THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT BECAUSE THE INDICTMENT SUFFICIENTLY PLEADS A CONSPIRACY TO VIOLATE THE ANTI-KICKBACK STATUTE AND THE ANTI-KICKBACK STATUTE IS NOT UNCONSTITUTIONALLY VAGUE. ................... 4

A. The Anti-Kickback Statute is Not Unconstitutionally Vague. .................... 8

B. The HRSA COVID-19 Program is a "Federal Health Care Program" under the Anti-Kickback Statute and Does Not Render the Anti-Kickback Statute Unconstitutionally Vague. ...................................................................... 13

C. The OIG FAQ Does Not Render the Anti-Kickback Statute Vague and Does Not Prevent the United States from Establishing Intent. ................... 18

D. The "Bona Fide Employment Relationships" Safe Harbor Provision of the Anti-Kickback Statute Is An Affirmative Defense, Not An Essential Element of The Indictment, and Does Not Render the Statute "Void for Vagueness." ........................................................................... 23

E. The Indictment Sufficiently Alleges the Defendants Had the Requisite *Mens Rea.* ........................................................................... 27

F. A De Minimis Incorrect Statutory Provision Does Not Warrant Dismissal of the Entire Indictment. ......................................................... 29

II. THE DRASTIC REMEDY OF SEVERANCE IS NOT WARRANTED ............... 34

A. Spillover Prejudice, If Any, Does Not Justify Severance of Aurangzeb ...... 36

B. Severance of Aurangzeb Under *Bruton* would be Premature ................... 41

III THE COURT SHOULD DISMISS DEFENDANTS' REMAINING OMNIBUS MOTIONS BECAUSE THEY ARE WITHOUT MERIT OR PREMATURE. ......... 42

A. Defendants' Request For A Hearing To Determine Which Co-Conspirator Recordings Should Be Admitted at Trial  Is Premature. ............................ 42

1. The CW Recordings are Largely Audible. ................................................. 43

2. The CW Recordings Have Not Been Altered. ........................................... 45

3. All Relevant Recordings Have Been Produced Pursuant to Rule 16 and the Court Should Not Order the United States to Produce an Irrelevant Recording.45

4. The Recording of Muhammed Aurangzeb's Post-Arrest Statement Has Not Been Altered. ........................................................................................... 46

B. Defendants' Request for a Bill of Particulars Should Be Denied Because Defendants Have Received a Detailed Indictment and Extensive Discovery. .................................................................................................. 47

1. Defendants' Individual Requests ............................................................. 53

C. Din's Motion to Strike Surplusage from the Indictment Should Be Denied. .................................................................................................... 59

1. The Term "Other" is not Surplusage .................................................... 60

2. The Term "Kickback" is not Surplusage. ................................................ 61

D. The United States Did Not Abuse the Grand Jury When the United States Issued Subpoenas Regarding Unindicted Individuals. ............................... 62

E. The United States Has Complied with and Will Continue to Comply with Its Discovery Obligations With Respect to *Brady*, Rule 16, *Giglio*, Rule 404(b), and Rough Agent Notes, and so Defendants' Motions Should be Denied as Moot.     63

1. *Brady and Rule 16*. .............................................................................. 63

2. *Giglio and Jencks*. .............................................................................. 64

3. Rule 404(b) ......................................................................................... 66

4. *Rough Agent Notes* ............................................................................. 67

F. Din's Motion for Immediate Identification of Experts and Production of Expert Reports Should Be Denied Without Prejudice. .............................. 68

G. Defendants Should Be Permitted to File Additional Motions So Long As They are Based on New Facts or Evidence. ............................................... 68

IV. THE COURT SHOULD DENY SYED'S MOTION TO COMPEL GRAND JURY
TRANSCRIPTS AND PURPORTED "BRADY / GIGLIO" RELATED TO
UNINDICTED INDIVIDUALS ........................................................................ 69

A. Syed Fails to Show a Particularized Need for Grand Jury Transcripts...... 69

B. Syed's Motion to Compel "Brady and Giglio" related to Charging Decisions
Should Be Denied..................................................................................... 76

V. SYED'S MOTION FOR A *FRANKS* HEARING SHOULD BE DENIED............ 77

A. Syed Has Not Made A Substantial Preliminary Showing That the Affiant
Knowingly or Recklessly Included a False Statement In, or Omitted Facts
From, The Affidavit................................................................................... 79

B. Even If Syed Had Made A Substantial Preliminary Showing That The
Affiant Knowingly Or Recklessly Included A False Statement Or Omitted
Facts From The Affidavit, They Were Not Necessary To The Finding Of
Probable Cause. ....................................................................................... 81

VI. THE DEFENDANTS SHOULD BE ORDERED TO PRODUCE RECIPROCAL
DISCOVERY AND PRIOR DEFENSE WITNESS STATEMENTS. .................... 83

CONCLUSION ................................................................................................ 84

## <u>TABLE OF AUTHORITIES</u>

*Cases*                                                                        *Pages*

*Bordenkircher v. Hayes,*
   434 U.S. 357 (1978) ............................................................... 77

*Brady v. Maryland,*
   373 U.S. 83 (1963) ........................................................... 64, 76

*Bruton v. United States,*
   391 U.S. 123 (1968) ............................................................... 34

*Buehl v. Vaughn,*
   166 F.3d 163 (3d Cir. 1999) ................................................. 66

*Costello v. United States,*
   350 U.S. 359 (1956) ................................................................. 6

*Dempsey v. Bucknell Univ.,*
   834 F.3d 457 (3d Cir. 2016) ................................................. 79

*Douglas Oil Co. v. Petrol Stops N.W.,*
   441 U.S. 211 (1979) ............................................................... 71

*Franks v. Delaware,*
   438 U.S. 154 (1978) ............................................................... 78

*Giaccio v. Penn.,*
   382 U.S. 399 (1966) ................................................................. 9

*Giglio v. United States,*
   405 U.S. 150 (1972) ............................................................... 76

*Glass v. United States,*
   2017 WL 2799985 (E.D. Tenn. June 27, 2017) ......................... 75

*Hamling v. United States,*
   418 U.S. 87 (1974) ....................................................... 5, 28, 72

*Hanlester Network v. Shalala,*
   51 F.3d 1390 (9th Cir. 1995) ................................................. 12

*In re Grand Jury Proceedings,*
   632 F.2d 1033 (3d Cir.1980) ............................................. 62, 63

*In re Grand Jury Proceedings, (Schofield,*
   I), 486 F.2d 85 (3d Cir. 1973) ........................................... 63, 64

iv

*Keck v. United States,*
   172 U.S. 434 (1899) ................................................................................ 33

*Kolender v. Lawson,*
   461 U.S. 352 (1983) ................................................................................ 28

*Kotteakos v. United States,*
   328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ..................................... 74

*N. Jersey Media Grp. Inc v. United States,*
   836 F.3d 421 (3d Cir. 2016) ...................................................................... 52

*Palermo v. United States,*
   360 U.S. 343 (1959) ................................................................................ 65

*Papachristou v. City of Jacksonville,*
   405 U.S. 156 (1972) .................................................................................. 8

*Ruan v. United States,*
   597 U.S. 450 (2022) ........................................................................... 24, 26

*Russell v. United States,*
   369 U.S. 749 (1962) ................................................................................ 31

*Short v. United States,*
   471 F.3d 686 (6th Cir. 2006) .................................................................... 32

*Skilling v. United States,*
   561 U.S. 358 (2010) .................................................................................. 9

*Smith v. Goguen,*
   415 U.S. 566 (1974) .................................................................................. 9

*United States v. Addonizio,*
   451 F.2d 49 (3d Cir. 1971) ........................................................................ 48

*United States v. Alsugair,*
   256 F. Supp. 2d 306 (D.N.J. 2003) ......................................................... 60, 61

*United States v. Ammar,*
   714 F.2d 238 (3d Cir. 1983) ...................................................................... 67

*United States v. Aragon-Hernandez,*
   2007 WL 315351 (N.D. Iowa Jan. 31, 2007) ........................................... 43, 44

*United States v. Atwell,*
   Crim. No. 13-560, 2015 WL 2092687 (D.N.J. May 5, 2015) ..................... 52, 57

*United States v. Barr,*
   963 F.2d 641 (3d Cir. 1992) ........................................ 75

*United States v. Beech-Nut Nutrition Corp.,*
   659 F. Supp. 1487 (E.D.N.Y. 1987) ............................... 51

*United States v. Bellomo,*
   263 F. Supp. 2d 561 (E.D.N.Y. 2003) ............................ 48

*United States v. Bergrin,*
   650 F.3d 257 (3d Cir. 2011) ......................................... 7

*United States v. Besmajian,*
   910 F.2d 1153 (3d Cir. 1990) ....................................... 6

*United States v. Bissell,*
   954 F. Supp. 841 (D.N.J. 1996) ................................... 65

*United States v. Blackwell,*
   954 F. Supp. 944 (D.N.J. 1997) ................................... 66

*United States v. Blair,*
   2021 WL 4339132 (D. Md. Sept. 23, 2021) ........................ passim

*United States v. Blake,*
   288 F. App'x 791 (3d Cir. 2008) .................................. 28

*United States v. Bobb,*
   471 F.3d 491 (3d Cir. 2006) ....................................... 75

*United States v. Boffa,*
   513 F. Supp. 444 (D. Del. 1980) .................................. 52

*United States v. Boyd,*
   180 F.3d 967 (8th Cir. 1999) ...................................... 36

*United States v. Boyd,*
   595 F.2d 120 (3d Cir. 1978) ....................................... 74

*United States v. Brown,*
   303 F.3d 582 (5th Cir. 2002) ...................................... 68

*United States v. Budd,*
   496 F.3d 517 (6th Cir. 2007) ...................................... 32

*United States v. Budzanoski,*
   462 F.2d 443 (3d Cir.), *cert denied,* 409 U.S. 949 (1972) ........... 71

*United States v. Capener,*
   2006 WL 8429828 (D. Nev. Sept. 22, 2006) ................................................. 10

*United States v. Cardascia,*
   951 F.2d 474 (2d Cir. 1991) ....................................................................... 39

*United States v. Caruso,*
   948 F. Supp. 382 (D.N.J. 1996) ............................................................. 50, 59

*United States v. Chalhoub,*
   No. 16-CR-23, 2018 WL 9802145 (E.D.Ky. Feb. 16, 2018) .......................... 10

*United States v. Chartock,*
   283 F. App'x 948 (3d Cir. 2008) .................................................................. 9

*United States v. Coburn,*
   39 F. Supp. 3d 361 (D.N.J. 2020) ............................................................... 57

*United States v. Coffey,*
   361 F. Supp. 2d 102 (E.D.N.Y. 2005)........................................................... 58

*United States v. Console,*
   13 F.3d 641 (3d Cir. 1993) ......................................................................... 40

*United States v. Cook,*
   2018 WL 1744682 (M.D. Pa. April 11, 2018).............................................. 57

*United States v. Crabb,*
   2008 WL 794871 (M.D. Pa. Mar. 24, 2008) ................................................ 52

*United States v. Crinel,*
   2015 WL 3755896 (E.D. La. June 16, 2015) ............................................... 25

*United States v. Crinel,*
   2016 WL 3877976 (E.D. La. July 18, 2016) ................................................ 39

*United States v. Dardi,*
   330 F.2d 316 (2d Cir. 1964) ....................................................................... 63

*United States v. Davis,*
   2014 WL 6679199 (S.D. Tex. Nov. 25, 2014)........................................ 25, 55

*United States v. DeLaurentis,*
   230 F.3d 659 (3d Cir. 2000) ......................................................................... 7

*United States v. Delle Donna,*
   552 F. Supp. 2d 475 (D.N.J. 2008) ....................................................... 54, 58

*United States v. DePeri,*
   778 F.2d 963 (3d Cir. 1985) ............................................................. 35, 40

*United States v. Depiro,*
   2013 WL 663303 (D.N.J. Feb. 20, 2013) ..................................................... 58

United *States v. Eggleston,*
   823 F. App'x 340 (6th Cir. 2020) ......................................................... 25

*United States v. Eufrasio,*
   935 F.2d 553 (3d Cir. 1991) ...................................................... 34, 38, 48

*United States v. Evans,*
   2021 WL 5279896 (E.D. Pa. Nov. 12, 2021) ........................................ 32, 33

*United States v. Ferrarini,*
   9 F. Supp. 2d 284 (S.D.N.Y. 1998) ........................................................ 39

*United States v. Ferriero,*
   866 F.3d 107 (3d Cir. 2017) .............................................................. 28

*United States v. Forde,*
   740 F. Supp. 2d 406 (S.D.N.Y. 2010) ...................................................... 72

*United States v. Freeman,*
   763 F.3d 322 (3d Cir. 2014) .............................................................. 75

*United States v. Frost,*
   999 F.2d 737 (3d Cir. 1993) .............................................................. 79

*United States v. George,*
   900 F.3d 405 (7th Cir. 2018) ............................................................. 25

*United States v. Giampa,*
   904 F. Supp. 235 (D.N.J. 1995) ........................................................... 59

*United States v. Goldman,*
   607 Fed. App'x 171 (3d Cir. 2015) ........................................................ 27

*United States v. Goodwin,*
   457 U.S. 368 ............................................................................ 76

*United States v. Grasso,*
   173 F. Supp. 2d 353 (E.D. Pa. 2001) ...................................................... 51

*United States v. Hagen,*
   60 F.4th 932 (5th Cir. 2023) ............................................................. 24

*United States v. Hart,*
    273 F.3d 363 (3d Cir. 2001) ........................................................ 35, 37, 40

*United States v. Hedgepeth,*
    434 F.3d 609 (3d Cir. 2006) ........................................................ 59, 60, 61

*United States v. Higgs,*
    713 F.2d 39 (3d Cir. 1983) ........................................................ 65

*United States v. Hill,*
    976 F.2d 132 (3d Cir. 1992) ........................................................ 65

*United States v. Hoffert,*
    949 F.3d 782 (3d Cir. 2020) ........................................................ 8, 28

*United States v. Huet,*
    665 F.3d 588 (3d Cir. 2012) ........................................................ 7

*United States v. Inigo,*
    925 F.2d 641 (3d Cir. 1991) ........................................................ 35

*United States v. Jackson,*
    649 F.2d 967 (3d Cir. 1981) ........................................................ 41

*United States v. John-Baptiste,*
    747 F.3d 186 (3d Cir. 2014) ........................................................ 8

*United States v. Johnson,*
    2022 WL 2953905 & n.5 (W.D. Pa. July 26, 2022) ...................................... 41

*United States v. Karmue,*
    841 F.3d 24 (5th Cir. 2016) ........................................................ 33

*United States v. Kemp,*
    500 F.3d 257 (3d Cir. 2007) ........................................................ 5, 9, 28

*United States v. Kemp,*
    2004 WL 2757867 (E.D. Pa. Dec. 2, 2004) ............................................ 53

*United States v. Kenny,*
    462 F.2d 1205 (3d Cir. 1972) ........................................................ 48

*United States v. Knight,*
    2013 WL 3367259 (E.D. Pa. July 3, 2013) ............................................ 54, 58

*United States v. Lacerda,*
    2013 WL 3177814 (D.N.J. June 19, 2013) ............................................ 53, 54

*United States v. Lahue,*
  261 F.3d 993 (10th Cir. 2001) ................................................................ 12

*United States v. Lake,*
  985 F.2d 265 (6th Cir. 1993) ................................................................. 32

*United States v. Levin,*
  973 F.2d 463 (6th Cir. 1992) ............................................................ 20, 21

*United States v. Lindauer,*
  No. 03-CR-807, 2004 WL 2813168 (S.D.N.Y. Dec. 6, 2004)......................... 37

*United States v. Lore,*
  430 F.3d 190 (3d Cir. 2005) ......................................................... 35, 36, 39

*United States v. Malik,*
  2009 WL 1922257 (E.D. Pa. July 2, 2009) ................................................ 38

*United States v. Mariani,*
  7 F. Supp. 2d 556 (M.D. Pa. 1998) ......................................................... 57

*United States v. McGlory,*
  968 F.2d 309 (3d Cir. 1992) .................................................................. 34

*United States v. McLean,*
  715 F.3d 129 (4th Cir. 2013) ................................................................. 10

*United States v. Med 1st,*
  2017 WL 4848823 (W.D. Ky. Oct. 26, 2017) ............................................ 10

*United States v. Miller,*
  116 F.3d 641 (2d Cir.1997) .............................................................. 31, 32

*United States v. Mitchell,*
  652 F.3d 387 (3d Cir. 2011) ................................................................... 8

*United States v. Morales,*
  280 F. Supp. 2d 262 (S.D.N.Y. 2003) ...................................................... 67

*United States v. Moss,*
  9 F.3d 543 (6th Cir. 1993) .................................................................... 60

*United States v. Motamedi,*
  2019 WL 5212991 (N.D. Cal. Oct. 16, 2019) ....................................... 12, 22

*United States v. Moyer,*
  674 F.3d 192 (3d Cir. 2012) ............................................................. 50, 54

*United States v. Muhammad,*
    120 F.3d 688 (7th Cir. 1997) ................................................................. 68

*United States v. Munoz,*
    736 F. Supp. 502 (S.D.N.Y. 1990) .......................................................... 50

*United States v. Nachamie,*
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) ....................................................... 56

*United States v. Naegele,*
    474 F. Supp. 2d 9 (D.D.C. 2007) ............................................................ 72

*United States v. Nat'l Dairy Prod. Corp.,*
    372 U.S. 29 (1963) .................................................................................. 9

*United States v. Nelson,*
    852 F.2d 706 (3d Cir.1988) ................................................................... 31

*United States v. Nicholson,*
    815 F.2d 61 (8th Cir.1987) ..................................................................... 44

*United States v. Norton,*
    17 F. App'x 98 (4th Cir. 2001) ............................................................... 25

*United States v. Novak,*
    2014 WL 2937062 (N.D. Ill. June 30, 2014) .......................................... 25

*United States v. Oakar,*
    111 F.3d 146 (D.C. Cir. 1997) ............................................................... 59

*United States v. Pavulak,*
    700 F.3d 651 (3d Cir. 2012) ............................................................ 81, 82

*United States v. Perez,*
    280 F.3d 318 (3d Cir. 2002) ................................................................. 75

*United States v. Pharis,*
    298 F.3d 228 (3d Cir. 2002) ................................................................. 60

*United States v. Pike Indus., Inc.,*
    575 F. Supp. 885 (D. Vt. 1983) ............................................................. 72

*United States v. Potashnik,*
    2008 WL 5272807 (N.D. Tex. Dec. 17, 2008) ....................................... 39

*United States v. Provenzano,*
    688 F.2d 194 (3d Cir. 1982) ................................................................. 35

*United States v. Qayyum,*
  1998 WL 159056 (S.D.N.Y. Apr. 1, 1998) ................................................... 54

*United States v. Ramos,*
  27 F.3d 65 (3d Cir. 1994) ................................................................. 68, 69

*United States v. Rankin,*
  870 F.2d 109 (3d Cir. 1989) ...................................................................... 5

*United States v. Resendiz-Ponce,*
  549 U.S. 102 (2007) .................................................................................. 6

*United States v. Richardson,*
  780 F.3d 812 (7th Cir. 2015) ................................................................... 75

*United States v. Robinson,*
  707 F.2d 872 (6th Cir.1983) .................................................................... 43

*United States v. Rosa,*
  891 F.2d 1063 (3d Cir. 1989) ............................................................. 48, 52

*United States v. Salerno,*
  481 U.S. 739 (1987) .................................................................................. 8

*United States v. Sampson,*
  2012 WL 214707 (M.D. Pa. Jan. 24, 2012) .............................................. 58

*United States v. Savage,*
  2012 WL 6609425 (E.D. Pa. Dec. 19, 2012),
  *aff'd* 85 F.4th 102 (3d Cir. 2023) ........................................................... 39

*United States v. Scaife,*
  749 F.2d 338 (6th Cir. 1984) ................................................................... 43

*United States v. Scarpa,*
  913 F.2d 993 (2d Cir. 1990) .................................................................... 60

*United States v. Scolnick,*
  392 F.2d 320 (3d Cir. 1968) .................................................................... 65

*United States v. Shaw,*
  106 F. Supp. 2d 103 (D. Mass. 2000) ................................................. 14, 24

*United States v. Singhai,*
  876 F. Supp. 2d 82 (D.D.C. 2012) ........................................................... 72

*United States v. Sisson,*
  399 U.S. 267 (1970) ................................................................................ 24

*United States v. Skelos,*
   Crim. No. 15-317, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .................. 51

*United States v. Smith,*
   776 F.2d 1104 (3d Cir. 1985) ...................................................48, 51, 52, 53

*United States v. Smukler,*
   330 F. Supp. 3d 1050 (E.D. Pa. 2018) ....................................................... 57

*United States v. Solomonyan,*
   451 F. Supp. 2d 626 (S.D.N.Y. 2006) ........................................................ 67

*United States v. Somers,*
   496 F.2d 723 (3d Cir. 1974) .............................................................. 36, 37

*United States v. Sourlis,*
   963 F. Supp. 568 (D.N.J. 1996) ......................................................... 54, 74

*United States v. Spicer,*
   2013 WL 871952 (E.D.N.Y. Mar. 7, 2013) ............................................ 37, 39

*United States v. Starks,*
   157 F.3d 833 (11th Cir. 1998) ................................................................. 12

*United States v. Stevenson,*
   832 F.3d 412 (3d Cir. 2016) .................................................................... 31

*United States v. Thompson,*
   219 F. Supp. 3d 502 (M.D. Pa. 2016)....................................................... 40

*United States v. Torres,*
   901 F.2d 205 (2d Cir. 1990) .................................................................... 57

*United States v. Trie,*
   23 F. Supp. 2d 55 (D.D.C. 1998) ............................................................. 72

*United States v. Turner,*
   561 F. App'x 312 (5th Cir. 2014) ............................................................. 25

*United States v. Urban,*
   404 F.3d 754 (3d Cir. 2005) ........................................................... passim

*United States v. Valentine,*
   984 F.2d 906 (8th Cir. 1993) ................................................................... 36

*United States v. Vella,*
   562 F.2d 275 (3d Cir. 1977) .................................................................... 68

*United States v. Vernon,*
  723 F.3d 1234 (11th Cir. 2013) ................................................................ 25

*United States v. Vitillo,*
  490 F.3d 314 (3d Cir. 2007) ....................................................................... 6

*United States v. Voigt,*
  89 F.3d 1050 (3d Cir. 1996) ..................................................................... 35

*United States v. Wabo,*
  290 F. Supp. 2d 486 (D.N.J. 2003) .................................................... 52, 58

*United States v. Ward,*
  793 F.2d 551 (3d Cir. 1986) ..................................................................... 38

*United States v. Werme,*
  939 F.2d 108 (3d Cir. 1991) ....................................................................... 7

*United States v. Williams,*
  218 F. Supp. 3d 730 (N.D. Ill. Oct. 31, 2016) ................................ 11, 12, 22

*United States v. Williams,*
  553 U.S. 285 (2008) .................................................................................... 9

*United States v. Willis,*
  844 F.3d 155 (3d Cir. 2016) ....................................................................... 6

*United States v. Yielding,*
  657 F.3d 688 (8th Cir. 2011) .................................................................... 25

*United States v. Yusuf,*
  461 F.3d 374 ....................................................................... 78, 80, 81, 82

*United States v. Zolp,*
  659 F. Supp. 692 (D.N.J. 1987) ......................................................... 48, 52

*Wayte v. United States,*
  470 U.S. 598 (1985) ...................................................................... 72, 73, 77

*Zafiro v. United States,*
  506 U.S. 534 (1993) ............................................................. 34, 35, 36, 39

**Statutes**

5 U.S.C. § 89 ................................................................................................ 14

18 U.S.C. § 24(b) ................................................................................... passim

18 U.S.C. § 220(e)(3) ................................................................................... 29, 30, 33

18 U.S.C. § 371 ......................................................................................................... 6, 28

18 U.S.C. § 1347 ........................................................................................................... 30

18 U.S.C. § 3500(a) ...................................................................................................... 65

21 U.S.C. § 841 ............................................................................................................ 26

42 U.S.C. 300gg-91 ...................................................................................................... 17

42 U.S.C. 300hh–11 ..................................................................................................... 16

42 U.S.C § 1320a–7b(b)(1)(B) ............................................................................. passim

42 U.S.C. § 1320a–7b(b)(2)(B) ........................................................................... passim

42 U.S.C. § 1320a-7b(b)(3) .......................................................................................... 23

42 U.S.C. § 1320a-7b(b)(3)(B) ..................................................................................... 24

42 U.S.C. § 1320a-7b(f) ...................................................................................... passim

P.L. 116-127 ................................................................................................................. 15

P.L. 116-139 ................................................................................................................. 16

Pub. L. No. 100-93 ....................................................................................................... 23

### Rules

Fed. R. Civ. P. 3 .......................................................................................................... 75

Fed. R. Crim. P. 6(e) .................................................................................................... 71

Fed. R. Crim. P. 7(c)(1) ........................................................................................... 5, 28

Fed. R. Crim. P. 7(d) .................................................................................................... 59

Fed. R. Crim. P. 12(b)(2) ............................................................................................... 7

Fed. R. Crim. P. 12(b)(3)(B) ..................................................................................... 6, 27

Fed. R. Crim. P. 14(a) .................................................................................................. 35

Fed. R. Crim. P. 16(b) .................................................................................................. 83

Fed. R. Crim. P. 26.2 .................................................................................................... 65

Fed. R. Crim. P. 29 .................................................................................... 7

Fed. R. Crim. P. 58(b) ............................................................................. 75

Fed. R. Evid. 404(b) .................................................................................. 66

### *Regulations*

42 C.F.R. § 1001.952 ................................................................................ 24

Revisions to the Safe Harbors Under the Anti-Kickback Statute and Civil
   Monetary Penalty Rules Regarding Beneficiary Inducements,
   81 Fed. Reg. 88368-01, 2016 WL 7103282 (Dec. 7, 2016) .......................... 23

### *Other*

Medicare-Medicaid Antifraud and Abuse Amendments, H.R. Rep. No. 95-393,
   pt. 2 (July 12, 1977) .................................................................................. 14

## INTRODUCTION

The Government respectfully submits this memorandum of law in opposition to Defendants' pre-trial motions.  These motions have no merit, and, for the reasons set forth below, they should be denied. Additionally, the United States is entitled to reciprocal discovery and statements of potential defense witnesses.  The United States thus requests that Defendants produce reciprocal discovery immediately and any statements of potential witnesses at the time of *Jencks* disclosures.

## BACKGROUND

At trial, the United States anticipates that it will introduce evidence demonstrating the following facts:[1]

During the global COVID-19 pandemic, the federal government directed billions of dollars in aid to health care facilities and providers through the HRSA COVID-19 Uninsured Program, which reimbursed eligible providers for claims attributed to COVID-19 testing, treatment, or vaccine administration for uninsured individuals.  Federal programs appropriated $2 billion specifically to reimburse providers for conducting COVID-19 testing for patients who were uninsured.

---

[1]  The facts set forth here are only those facts relevant to resolving the issues raised in Defendants' pretrial motions and do not include other facts the Government intends to introduce at trial against the Defendants concerning the violations of the Anti-Kickback Statute.

Metpath Laboratories, Inc., which was operated and controlled by Defendants Abid Syed and Tariq Din,[2] was a clinical laboratory in Parsippany, New Jersey, that, among other things, conducted COVID-19 testing on samples that had been collected from individual patients and sent to Metpath.

In order to maximize the number of COVID-19 samples they collected and tested, during 2021 and 2022, Defendants Din and Syed paid referral fees to marketers who sent samples to Metpath.  Typically, Din and Syed paid the marketers between $5 and $30 per sample and then billed the HRSA COVID-19 Uninsured Program and Medicare, among other insurance providers, for the tests.

Syed and Din paid several different marketers to direct COVID-19 tests to Metpath, including confidential witness 1 ("CW-1"), who is referred to as Individual-1 in the Indictment.  CW-1 was first introduced to Syed and Din in early 2021 by Tauqir Khan, who told CW-1 that Metpath would pay CW-1 between $20 to $25 per COVID-19 test.  Shortly thereafter, CW-1 met with Syed at Metpath and Syed agreed to pay CW-1 $25 for every COVID-19 test CW-1 directed to Metpath.  Soon after this meeting, CW-1 began directing COVID-19 tests to Metpath.

To determine how much they owed each marketer, Din and Syed kept track of how many COVID-19 test samples each marketer sent to them so they could pay each marketer roughly every month.

---

[2] Metpath was also owned by another individual who is not named in the Indictment and is not relevant to Defendants' motions.

Because CW-1 began cooperating with the Government while he was being paid kickbacks for COVID-19 tests by Metpath, CW-1 began surreptitiously recording his interactions with Syed, Din, and others when he was picking up his kickback checks.  For example, in September 2021, Syed paid CW-1 a $2,825 kickback for the 113 COVID-19 samples that CW-1 had sent to Metpath at a rate of $25 per referral.  Syed explained their illicit arrangement during his recorded meeting with CW-1:

| | |
|---|---|
| CW-1: | Okay. Wow, busy. So how many did I have? |
| Syed: | 113. |
| CW-1: | For the month? |
| Syed: | For the month. |
| CW-1: | And that's 113 times? |
| Syed: | 25. |

Similarly, in November 2021, Syed paid CW-1 a $3,350 kickback for the 134 COVID-19 samples that CW-1 directed to Metpath, and described on a recording how he calculated the kickback: "That's 134 total, right? Yes. 134 times 25 which is 3-3-5-0."  Because CW-1 directed 134 COVID-19 tests to Metpath during the previously month, CW-1 received a kickback check for $3,350 (134 samples x $25 = $3,350).

Syed attempted to disguise the kickback payments to marketers. During one recorded conversation with Syed, CW-1 asked Syed why Syed was adding extra cents to his checks instead of using round numbers and the correct kickback amount owed to CW-1.  Syed told CW-1 that he identified CW-1 as a

xix

"consultant" on the check instead of a marketer and added a few extra cents to
conceal the kickbacks:

| | |
|---|---|
| CW-1: | Oh, by the way, on one of the checks there was like 50 cents in there. |
| Syed: | What do you mean 50 cents? |
| CW-1: | One of the checks you had like one thousand nine hundred . . . . |
| Syed: | I don't want to put a solid check, you know it's always better put a few cents so you know as we got it from this (waves at computer). |
| CW-1: | Oh I got ya. |
| Syed: | If we create solid, solid, checks you never know, medical business you never know. Anytime anything could be happening so it's better instead of all solid checks. |
| CW-1: | Yeah. |
| Syed: | Put a few cents. |
| CW-1: | I got you. |
| Syed: | Because I put you as a consultant (gesturing to computer screen) you know. Consultant you can give mileage, gas, whatever. A few cents is always . . . . |
| CW-1: | Yeah I got ya. |
| Syed: | Maybe next time I'll give you an extra 50 cents. |
| CW-1: | You're a peach. |

In addition to these recordings, law enforcement discovered detailed
summary charts when it executed a search warrant at Metpath in April 2022
documenting the COVID-19 tests sent by various marketers, including
Defendants Muhammed Aurangzeb and David Weathers, to Metpath in 2021 and
2022. These charts included how much Syed and Din had agreed to pay each
marketer per sample sent.

Additionally, during the execution of the search warrant law enforcement seized invoices purportedly from Weathers that attempt to disguise the kickback arrangement.   In order to disguise the kickbacks, the invoices break down Weathers' kickback payments to make them appear as if the payments are for other items, such as "gas," "hotel rental," "food," and "car service."

During the course of the conspiracy, Metpath paid CW-1 approximately $19,000 for the COVID-19 tests CW-1 directed to Metpath; paid Aurangzeb approximately $118,000 in kickback payments for the COVID-19 tests that he sent to Metpath; and paid Weathers approximately $1,366,007.00 in total kickback payments for the COVID-19 tests Weathers directed to Metpath. In total, Metpath was paid approximately $3,500,000 by federal programs for those COVID-19 tests.

On December 6, 2022, Syed, Din, Weathers, and Aurangzeb were indicted in a one-count Indictment charging them with conspiring to violate the Anti-Kickback Statute. ECF No. 94.  On August 30, 2023, Tauqir Khan pled guilty to a one-count Information charging him with conspiring with Syed, Din, and others to violate the Anti-Kickback Statute and is awaiting sentencing.   *See United States v. Tauqir Khan*, Crim. No. 23-692 (BRM), ECF Nos. 113, 117 (Information and Plea Agreement).  On February 26, 2024, Weathers also pleaded guilty to the Indictment charging him with conspiring with Syed, Din, and others to violate the Anti-Kickback Statute, and is awaiting sentencing.  ECF No. 163 (Plea Agreement).  A trial date in this case has not yet been set.

**SUMMARY OF DEFENDANTS' PRE-TRIAL MOTIONS**

| Def. | Pretrial Motion | Date Filed | ECF No. |
|---|---|---|---|
| Din | Omnibus Pretrial Motions, including motions for:<br><br>• A Hearing Regarding the Admissibility of CW and Co-Conspirator Recordings<br><br>• Severance<br><br>• A Bill of Particulars<br><br>• Striking of Surplusage<br><br>• Abuse of Grand Jury<br><br>• Disclosure of *Brady*, Rule 16, *Giglio*, *Jencks*, Rule 404(b), and Rough Agent Notes<br><br>• Disclosure of Expert Witnesses<br><br>• Request to File Additional Motions | May 13, 2024 | 169 |
| Syed | Motion for *Franks* Hearing | May 13, 2024 | 170 |
| Syed | Motion to Compel Grand Jury Transcripts and *Brady / Giglio* | May 13, 2024 | 171 |

| | | | |
|---|---|---|---|
| Aurangzeb | Omnibus Pretrial Motions, including motions for:<br><br>• Dismissal of the Indictment<br><br>• Severance<br>• A Hearing Regarding the Admissibility of Co-Conspirator Statements<br><br>• Disclosure of Brady<br><br>• Disclosure of Rule 404(b) Evidence<br><br>• Disclosure of *Giglio* / *Jencks*<br><br>• A Hearing Regarding the Audibility and Admissibility of Recordings<br><br>• Order to Preserve Rough Notes<br><br>• Request to File Additional Motions | May 13, 2024 | 173 |
| Din | Motion to Dismiss Indictment because:<br><br>• The COVID-19 Uninsured Program is not a Federal Health Care Program<br><br>• The Existence of OIG Policy Statements and FAQs<br><br>• The Bona Fide Employment Relationship Safe Harbor Provision is Void for Vagueness | May 13, 2024 | 174 |

|  | <ul><li>The Indictment Fails to Plead an Essential Element of the Crime</li><li>The Indictment Fails to Cite the Correct Statutory Provision that is an Element of the Offense Charged</li></ul> |  |  |
|---|---|---|---|

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## ARGUMENT

I.  **THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT BECAUSE THE INDICTMENT SUFFICIENTLY PLEADS A CONSPIRACY TO VIOLATE THE ANTI-KICKBACK STATUTE AND THE ANTI-KICKBACK STATUTE IS NOT UNCONSTITUTIONALLY VAGUE.**

Defendants move to dismiss the Indictment on various grounds. Din, joined by Syed, argues that the HRSA Covid-19 Uninsured Program—a federal program instituted during the COVID-19 pandemic to provide COVID-related health benefits for the uninsured—is not a federal health care program, and so any reference to it should be stricken. Defendants also contend that the Indictment's allegations about the HRSA COVID-19 Uninsured Program should be dismissed under the void-for-vagueness doctrine because ordinary people supposedly could not understand that the federally funded HRSA COVID-19 Uninsured Program is a "Federal health care program." ECF No. 174 at 12-17. Din, joined by Syed, argues that a Department of Health and Human Services Office of Inspector General informal guidance document—not a law, not even a regulation— regarding laboratory-pharmacy arrangements during the COVID-19 pandemic renders the entire Indictment void for vagueness and also prevents the United States from being able to establish *mens rea*. ECF No. 174 at 17-22.  All Defendants argue that the Anti-Kickback Statute's bona fide employee safe harbor is void for vagueness and is also an element of the offense the United States has failed to allege. ECF No. 174 at 22-29; ECF No. 173 at 2-7, 9-15. Aurangzeb argues that the indictment fails to allege Aurangzeb had the required intent, knowledge or awareness that his conduct

4

was illegal. ECF No. 173 at 7-9.  Finally, Syed, joined by Din, argues that the

Indictment should be dismissed because of an incorrect statutory citation.

ECF No. 174 at 29-32. For the reasons discussed below, all of the motions

should be denied.

An indictment must contain only a "plain, concise, and definite written

statement of the essential facts constituting the offense charged."  Fed. R.

Crim. P. 7(c)(1).  An indictment is sufficient so long as it

> (1) contains the elements of the offense intended to be charged,
>
> (2) sufficiently apprises the defendant of what he must be prepared to meet, and
>
> (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.

*United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (rejecting multiple

challenges to the sufficiency of an indictment charging honest services fraud)

(internal citations omitted); *accord Hamling v. United States*, 418 U.S. 87, 117

(1974) (similar standard under Constitutional requirements); *United States v.*

*Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).  No greater specificity than the

statutory language is required so long as there is sufficient factual orientation

to permit the defendant to prepare his defense and to invoke double jeopardy in

the event of a subsequent prosecution.  *Kemp*, 500 F.3d at 280.  As the

Supreme Court has explained:

> [T]he Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.   While detailed allegations might well have been

5

required under common-law pleading rules, they surely are not
contemplated by [Federal Rule of Criminal Procedure] 7(c)(1).

*United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (citations and

internal quotation marks omitted).

The Indictment does what *Kemp* requires:  it alleges the elements of

conspiracy under 18 U.S.C. § 371, tracks the relevant statutory language of the

Anti-Kickback Statute, 42 U.S.C § 1320a–7b(b)(1)(B) and (b)(2)(B), and includes

ample factual detail to enable Defendants to understand the single-count

charge and prepare their defense.  Nothing more is required.

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a defendant to

move to dismiss an indictment for "failure to state an offense."  But as the

Third Circuit has recognized, "'[a]n indictment returned by a legally constituted

and unbiased grand jury, like an information drawn by the prosecutor, if valid

on its face, is enough to call for trial of the charge on the merits.'"  *United

States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007) (quoting *Costello v. United

States*, 350 U.S. 359, 363 (1956) (footnote omitted)).  For purposes of Rule

12(b)(3)(B), a district court must "accept[] as true the factual allegations set

forth in the indictment."  *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d

Cir. 1990).  The "sufficiency of the indictment should be decided based on the

facts alleged within the four corners of the indictment, not the evidence outside

of it."  *Vitillo*, 490 F.3d at 321.  An indictment is sufficient "unless it is so

defective that it does not, by any reasonable construction, charge an offense."

*United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016).  Thus, a motion to

dismiss is not an appropriate vehicle to challenge the sufficiency of the

6

government's evidence, but only to challenge the legal sufficiency of the government's allegations.  *See United States v. DeLaurentis*, 230 F.3d 659, 660-61 (3d Cir. 2000); *see also* Fed. R. Crim. P. 12(b)(2) (limiting pretrial motions to those "that the court can determine without a trial of the general issue").  "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29."  *DeLaurentis*, 230 F.3d at 661.

Review of a motion to dismiss an indictment "is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury," and the Court should "limit its inquiry to the four corners of the Indictment" and not consider extrinsic evidence "to discern the Government's theory of the case."  *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011); *Huet*, 665 F.3d at 593.  Defendants' attempt to support their dismissal motion with numerous documents is obviously improper and contrary to the law.

In this case the Defendants have been specifically charged with conspiring to violate the Anti-Kickback Statute.  "To be legally sufficient, a conspiracy count in an indictment need only set forth the agreement and specific intent to commit an unlawful act."  *United States v. Werme*, 939 F.2d 108, 112 (3d Cir. 1991) (internal quotation marks and citation omitted).  "A conspiracy indictment need not allege every element of the underlying offense, but need only put defendants on notice that they are being charged with a conspiracy to commit the underlying substantive offense."  *Id.*  The Indictment in this case plainly does that.

**A. The Anti-Kickback Statute is Not Unconstitutionally Vague.**

Defendants raise a number of vagueness challenges to the Anti-Kickback Statute in this case, but do not clearly say whether they are mounting a facial challenge to the Anti-Kickback Statute or whether they assert it is unconstitutionally vague as applied to them. Their challenges fail under either standard. *See United States v. Mitchell*, 652 F.3d 387. 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid."); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial vagueness challenges are the "most difficult challenges to mount successfully"). Each of the Defendants' grounds for dismissal should be denied because the Anti-Kickback Statute is not unconstitutionally vague either as applied to Defendants or on its face.

A statute is unconstitutionally vague if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" or "encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *see also United States v. Hoffert*, 949 F.3d 782, 788 (3d Cir. 2020) (a due process violation arises only if "a criminal statute on which the conviction is based . . . is so standardless that it authorizes or encourages seriously discriminatory enforcement."). "A statute can be void for vagueness not only on its face, but as applied, as a result of an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *United States v. John-Baptiste*, 747 F.3d 186, 200 (3d Cir. 2014). "It is established that a law fails to meet the

8

requirements of the due process clause if it is so vague and standardless that it leaves judges or juries free to decide, without legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Penn.*, 382 U.S. 399, 403 (1966).

The void-for-vagueness doctrine is narrow. A statute is not void for vagueness simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). Rather, a statute is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 33 (1963).

In considering claims that charges in an indictment are unconstitutionally vague, the Third Circuit has recognized that "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Chartock*, 283 F. App'x 948, 953 (3d Cir. 2008) (citing *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)). Thus, courts have routinely rejected claims

9

that charges in similar health care fraud indictments are unconstitutionally vague, so long as sufficient information is pled to permit a defendant to prepare his defense and invoke double jeopardy.  *See Chalhoub*, 2018 WL 9802145 at *3-4; *Med 1st*, 2017 WL 4848823 at *2; *United States v. McLean*, 715 F.3d 129, 136-37 (4th Cir. 2013); *United States v. Capener*, 2006 WL 8429828, at *2 (D. Nev. Sept. 22, 2006).

Here, the single-count Indictment accords with due process and is not void for vagueness.  The Anti-Kickback Statute prohibits both the unlawful offering and paying of kickbacks and the unlawful soliciting and receipt of kickbacks. The Anti-Kickback Statute makes it unlawful to both "knowingly and willfully *offer or pay* any remuneration to any person" . . . to "induce such person" to recommend ordering a service—here COVID-19 test sampling—for which "payment may be made in whole or in part under a federal health care program,"  42 U.S.C. § 1320a–7b(b)(2)(B), and to "knowingly and willfully *solicit[] or receive* any remuneration" in return for recommending ordering a service—here COVID-19 test samples—for which "payment may be made in whole or in part under a federal health care program,"  42 U.S.C. § 1320a–7b(b)(1)(B).  The statute gives fair warning that offering or receiving something of value in exchange for referring COVID-19 test samples to Metpath is criminal, and that is precisely what the Indictment charges.  The Indictment sets out in detail the straightforward scheme by which the defendants agreed to violate the Anti-Kickback Statute.  Specifically, defendants Syed and Din paid "marketers," including Aurangzeb and Weathers, kickbacks to induce the

10

referral of COVID-19 test samples to Metpath by paying them between $5-$30 per COVID-19 test sample they caused to be referred to Metpath.  Ind. ¶¶ 6, 9. The Indictment lays out a straightforward application of the Anti-Kickback Statute that an ordinary person would know was unlawful.

Federal courts have repeatedly rejected motions to dismiss indictments charging violations of the Anti-Kickback Statute on vagueness grounds.  For example, in *United States v. Williams*, 218 F. Supp. 3d 730 (N.D. Ill. Oct. 31, 2016), the court rejected the defendant's void-for-vagueness argument and explained:

> [t]he Anti-Kickback statute provision at issue does provide a person of ordinary intelligence with a reasonable opportunity to know what is prohibited.  *At its basic level, the statute clearly forbids receiving money or goods, in any way, in exchange for referrals of Medicare patients to providers of services and good.*  In this case . . . the government demonstrated that [the defendant] received cash indirectly (through her company) in exchange for referring patients to receive home healthcare services paid for by Medicare.  This conduct is clearly covered by the statute.

*Id.* at 739-40 (emphasis added).

In addition to holding that the Anti-Kickback Statute is not vague, courts have held that any vagueness concerns are overcome by the high scienter requirement in the Anti-Kickback Statute.  In *Williams*, the court concluded, "[e]ven if the [Anti-Kickback] statute were ambiguous," the Anti-Kickback Statute "explicitly includes a high scienter requirement," which "overcomes any potential vagueness in the statute because a person who would otherwise be ensnared without notice does not violate the statute."  *Id.*  The court cited numerous courts that have similarly rejected vagueness challenges to the Anti-

Kickback Statute "on the basis that the requirement of willfulness—knowledge that the act is unlawful—mitigates any vagueness concerns." *Id.*; *see United States v. Lahue*, 261 F.3d 993, 1006 (10th Cir. 2001) (rejecting vagueness challenge to the Anti-Kickback Statute); *United States v. Starks*, 157 F.3d 833, 840 (11th Cir. 1998) ("although the statute does provide for criminal penalties, it requires 'knowing and willful' conduct, a mens rea standard that mitigates any otherwise inherent vagueness in the Anti-Kickback Statute's provisions"); *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("These factors militate against finding the anti-kickback statute void for vagueness.  The statute regulates only economic conduct. It chills no constitutional rights. While the statute allows for criminal penalties, it requires 'knowing and willful' conduct, a requirement which mitigates any vagueness in the statute."); *United States v. Blair*, 2021 WL 4339132, at *13-16 (D. Md. Sept. 23, 2021) (rejecting argument that Anti-Kickback Statute is void for vagueness because "[b]readth and expansiveness do not equate to vagueness" and, in any event, "the fact that the conduct must have occurred with the requisite *mens rea* 'overcomes any potential vagueness'") (*citing Williams*, 218 F. Supp. 3d at 739-40); *United States v. Motamedi*, 2019 WL 5212991, at *2 (N.D. Cal. Oct. 16, 2019) (similar).

Accordingly, the Anti-Kickback Statute is not void for vagueness on its face or as applied to Defendants or others, and their motions must be denied. The United States addresses each of Defendants' grounds for dismissal—on vagueness grounds or otherwise—below.

**B. The HRSA COVID-19 Program is a "Federal Health Care Program" under the Anti-Kickback Statute and Does Not Render the Anti-Kickback Statute Unconstitutionally Vague.**

Din, joined by Syed, argues that that the HRSA COVID-19 Uninsured Program is not a "federal health care program" as defined by the Anti-Kickback Statute and moves to either dismiss or strike from the Indictment any allegations regarding the HRSA COVID-19 uninsured program, ECF No. 174 at 12-13, and also moves to dismiss the COVID-19 Uninsured Program from the Indictment on void-for-vagueness grounds, ECF No. 174 at 12-13.  But the definition of "federal health care program" under the Anti-Kickback Statute is broad and the HRSA COVID-19 Uninsured Program—a federally-funded program created to provide health care coverage for certain uninsured individuals during the COVID-19 pandemic—falls squarely  within the statutory definition.   Defendants' motion should be denied.

As discussed above, Din has been charged with conspiring to violate 42 U.S.C. § 1320a-7b(b)(2)(B) and (b)(1)(B)(, which criminalizes the payment or receipt of kickbacks to induce any person to recommend a service or item—here, COVID-19 testing—when payment *may* be made "in whole or in part under a *Federal health care program.*"  42 U.S.C. § 1320a-7b(b)(2)(B), (b)(1)(B) (emphasis added).  The Anti-Kickback Statute is specifically "designed to prevent fraud and abuse in connection with federal health care programs," and was enacted in in 1977, when Congress amended the Social Security Act by adding the Medicare-Medicaid Anti-Fraud and Abuse Amendments. *See United States v. Blair*, 2021 WL 4339132, at *3 (D. Md. Sept. 23, 2021) (internal

quotations and citations omitted).  The amendment sought to address the "disturbing degree [of] fraudulent and abusive practices" associated with the provision of health services financed by federal programs. *Id.* (citing *United States v. Shaw*, 106 F. Supp. 2d 103, 110 (D. Mass. 2000) (citing H.R. Rep. No. 95-393, pt. 2, at 44 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3047).)

The definition of a "Federal health care program" is found within the Anti-Kickback Statute itself at 42 U.S.C. § 1320a-7b(f)):

### (f) "Federal health care program" defined

For purposes of this section, the term "Federal health care program" means—

> (1) *any* plan or program that provides health benefits, whether directly, through insurance, *or otherwise*, which is funded directly, *in whole or in part*, by the United States Government (other than the health insurance program under chapter 89 of title 5)[3]; or

> (2) any State health care program, as defined in section 1320a–7(h) of this title.

42 U.S.C. § 1320a-7b(f) (emphasis added).

This definition of "Federal health care program" is undisputedly broad to achieve the legislative objective of protecting federal programs.  By its own terms, it is not limited to standard federal health care insurance programs, such as Medicare or Medicaid, but instead includes *any* plan or program funded by the United States Government, whether it be in whole or in part.

---

[3] 5 U.S.C. § 89 governs the provision of health insurance coverage for certain federal employees.

The HRSA COVID-19 Uninsured Program is a plan or program funded by the United States Government.  As explained in the Indictment, the Health Resources and Services Administration ("HRSA") is a federal agency within the federal U.S. Department of Health and Human Services.  Ind. ¶ 1(j). HRSA "supports equitable health care for the nation's highest-need communities." See  https://www.hrsa.gov/about/agency-overview (last accessed June 19, 2024). During the pandemic, HRSA provided support to health care providers through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (what is known as the "HRSA COVID-19 Uninsured Program").  The HRSA COVID-19 Uninsured Program "provide[d] reimbursements on a rolling basis directly to eligible health care entities for claims that are attributed to the testing, treatment, and or vaccine administration of COVID-19 for uninsured individuals." https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3/about_data (last accessed June 19, 2024).  Also as explained in the Indictment and according to publicly available sources, the COVID-19 Uninsured Program was funded, in part, through several parts of COVID-19 related federal legislation enacted to provide resources for testing the uninsured for COVID-19, including:

- The American Rescue Plan Act ("ARPA") which provided $4.8 billion to reimburse providers for testing the uninsured. *See* Ind. ¶ 1(k)(v).

- The Families First Coronavirus Response Act ("FFCRA") Relief Fund, which includes funds received from the Public Health and Social Services Emergency Fund, as appropriated in the FFCRCA (P.L. 116-127) and the Paycheck Protection Program and Health Care

15

Enhancement Act ("PPP") (P.L. 116-139) (PPPHCEA), which each appropriated $1 billion to reimburse health care entities for conducting COVID-19 testing for the uninsured. *See* Ind. ¶ 1(k)(i).

*See* https://data.cdc.gov/Administrative/Claims-Reimbursement-to-Health-Care-Providers-and-/rksx-33p3/about_data (last accessed June 19, 2024). The billions of dollars that funded these programs came from *federal* legislation designed to use *federal* resources to help uninsured individuals receive COVID-19 testing.

As noted above, the FFCRA is COVID-19-related federal legislation enacted to provide resources for testing the uninsured for COVID-19, appropriating $1 billion to reimburse health care entities for conducting COVID-19 testing for the uninsured. https://www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq.  Din argues that the HRSA COVID-19 Uninsured Program cannot constitute a Federal health care program under 42 U.S.C. § 1320a-7b(f) because, when defining what constitutes an "uninsured" individual, the FFCRA exempted any person currently enrolled in a Federal health care program.  ECF No. 174 at 12-13; Luria Cert. Ex. 25.

PUBLIC HEALTH AND SOCIAL SERVICES EMERGENCY FUND

For an additional amount for "Public Health and Social Services Emergency Fund", $1,000,000,000, to remain available until expended, for activities authorized under section 2812 of the Public Health Service Act (42 U.S.C. 300hh–11), in coordination with the Assistant Secretary for Preparedness and Response and the Administrator of the Centers for Medicare & Medicaid Services, to pay the claims of providers for reimbursement, as described in subsection (a)(3)(D) of such section 2812, for health services consisting of SARS–CoV–2 or COVID–19 related items and services as described in paragraph (1) of section 6001(a) of division F of the Families First Coronavirus Response Act (or the administration of such products) or visits described in paragraph (2) of such section

16

for uninsured individuals:

**Provided, That the term "uninsured individual" in this paragraph means an individual who is not enrolled in—**
(1) a Federal health care program (as defined under section 1128B(f) of the Social Security Act (42 U.S.C. 1320a-7b(f)), including an individual who is eligible for medical assistance only because of subsection (a)(10)(A)(ii)(XXIII) of Section 1902 of the Social Security Act; or
(2) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market (as such terms are defined in section 2791 of the Public Health Service Act (42 U.S.C. 300gg-91)), or a health plan offered under chapter 89 of title 5, United States Code

That the FFCRA excludes those already covered by a federal health care program from the definition of "uninsured" makes good sense, because of course someone who is already covered by a federal health care program cannot be "uninsured." Quite simply, the HRSA COVID-19 Uninsured Program provides federal insurance for COVID-19 tests for people who are not covered by other federal insurance. This does not render the entire HRSA COVID-19 uninsured program a non-federal program.

42 U.S.C. § 1320a-7b(f) provides that a federal health care program is (1) any program (2) that provides health benefits that is (3) funded by the United States government. The COVID-19 Uninsured Program—a program designed to provided funding from the United States government to provide health benefits for the insured—is one. No reasonable person would conclude otherwise. The inclusion of the HRSA COVID-19 Uninsured Program as a federal health care program does not render the indictment void for vagueness, nor should any reference to it be stricken.

17

**C. The OIG FAQ Does Not Render the Anti-Kickback Statute Vague and Does Not Prevent the United States from Establishing Intent.**

Din, joined by Syed, also moves to dismiss the Indictment on the grounds that the OIG FAQ, an informal, non-binding guidance document, supposedly "blessed" the "exact" conduct defendants have been charged with and therefore prevents the United States from proving the required element of intent. ECF No. 174 at 20-21.  Din also argues that the OIG FAQ renders the Anti-Kickback Statute void for vagueness.  ECF No. 174 at 21-22.

Din's description of the OIG FAQ omits crucial facts.  During the COVID-19 pandemic, the HHS Office of Inspector General accepted inquiries from the health care community regarding the application of OIG's administrative enforcement authorities, including the Federal Anti-Kickback Statute.  The OIG issued "FAQs" related to approximately 19 different arrangements directly connected to the COVID-19 public health emergency.[4]  OIG applied certain limitations to the FAQs, including that "[t]he informal feedback furnished on this site does not bind or obligate HHS, the U.S. Department of Justice, or any other agency." https://oig.hhs.gov/coronavirus/authorities-faq.asp.  Based on that limiting language alone, Defendants' attempt to turn this "informal feedback" into an interpretation of the Anti-Kickback Statute that binds the Department of Justice or this Court should be rejected.

The OIG FAQ at issue addressed one question: "During the time period subject to the COVID-19 Declaration, can a clinical laboratory that bills

---

[4] OIG COVID-19 flexibilities, including these FAQs, ended upon the expiration of the COVID-19 Declaration on May 11, 2023.

Federal health care programs for laboratory test to diagnose COVID-19 pay a retail pharmacy a fee for certain costs that the retail pharmacy incurs related to testing collection sites."

In answering the question, the OIG FAQ begins by making clear that such an arrangement—where a laboratory that bills federal programs pays a pharmacy fees for COVID-19 test samples—"implicate[s] the Federal anti-kickback statute because the clinical laboratory would pay remuneration to a referral source (i.e., the retail pharmacy)."

https://oig.hhs.gov/coronavirus/authorities-faq.asp

However, the OIG FAQ concludes that so long as three specific criteria are met, the "proposed arrangement between the clinical laboratory and retail pharmacy, in the context of the COVID-19 public health emergency, would be sufficiently low risk": "(i) the retail pharmacy incurs costs in operating the testing collection sites; (ii) the payment is fair market value for the items and services furnished by the retail pharmacy in running the sites; and (iii) the retail pharmacy is not submitting claims to Federal health care programs—or directly or indirectly receiving other Federal or State funding—that reimburse it, in whole or in part, for the items and services furnished by the retail pharmacy in running the sites for which the laboratory reimburses the pharmacy."  The OIG FAQ goes on to emphasize, "[i]t is incumbent on the parties to determine a fair market value payment for the actual and necessary items and services furnished by the retail pharmacy."

https://oig.hhs.gov/coronavirus/authorities-faq.asp

19

Based on the plain allegations of the Indictment, which is all the Court may consider at this stage, this FAQ is inapplicable because the Indictment does not allege that a retail pharmacy was involved or that payments were fair market value.  Din argues that "[a]fter reading the OIG FAQ, an ordinary person would understand that the Government was authorizing a laboratory to pay a *person* or entity fair market value to collect COVID-19 specimens."  ECF No. 174 at 22. But the OIG FAQ never refers to individuals collecting COVID-19 specimens; it only refers repeatedly and explicitly to "retail pharmacies" that serve as collection sites for COVID-19 tests. No reasonable person would swap in "person" for "retail pharmacy," much less that OIG would bless a laboratory's payment of fees to individual marketers.

Din cites *United States v. Levin,* 973 F.2d 463 (6th Cir. 1992), to argue that, given this OIG FAQ, prosecution of Din is a violation of his Due Process rights and the United States is "unable as a matter of law" to "prove the required element of intent necessary to support a conviction in this case."  ECF No. 174 at 21. *Levin* is readily distinguishable for several reasons.  First, *Levin*—an out-of- circuit decision—does not involve a violation of the Anti-Kickback Statute; it involves Medicare fraud, false claims, mail fraud, and false statements. *Levin*, 973 F.2d at 464. Second, *Levin* involved formal approval letters from HHS's Health Care Financing Administration ("HCFA"), not informal OIG FAQs.  *Id.* at 465. Third, in *Levin* the federal prosecutors *agreed* that the HCFA approval letters at issue were directly applicable to the defendants. *Id.* at 466. For the reasons discussed above, the OIG FAQ in this

case was not applicable to Defendants and pertained only to laboratory-retail pharmacy relationships, not laboratory relationships with individual marketers.

Most importantly, *Levin* is distinguishable because the court relied in part on the doctrine of entrapment by estoppel, finding that, to determine the availability of the defense, the court must conclude that "(1) a government must have announced that the charged criminal act was legal; (2) the defendant relied on the government announcement; (3) the defendant's reliance was reasonable; and, (4) given the defendant's reliance, the prosecution would be unfair." *Id.* at 468. Ordinarily, this standard calls for factual determinations that would be inappropriate to determine at the motion to dismiss stage, but in *Levin* the prosecutor had conceded that there were "probably no dispute of the facts." And so the court was able to determine "[f]rom the undisputed operative facts" that "(1) HCFA and its duly designated representatives declared the sales promotion program, which was the predicate for the indictment, to be legal; (2) the appellees relied upon HCFA's announcement; (3) the defendants' reliance was reasonable; and (4) prosecution for violation of the controversial counts of the indictment would be unfair." Clearly, here, there are disputed facts about the applicability of the informal OIG FAQ discussing laboratory-pharmacy relationships and the Defendants' reasonable reliance on the OIG FAQ. Din's reliance on this out-of-circuit decision should be rejected.

The Court should deny the Defendants' motion to dismiss on any grounds related to the OIG FAQ because this inapplicable, informal OIG FAQ

21

does not render the Anti-Kickback Statute unconstitutionally vague or prevent the United States from being able to prove Defendants' mens rea *at trial*. Indeed, as discussed above, courts have routinely denied motions to dismiss the Anti-Kickback Statute on vagueness grounds because of the Statute's strong scienter requirement. *See, e.g., Williams*, 218 F. Supp. 3d at 740 ("[e]ven if the [Anti-Kickback] statute were ambiguous," the Anti-Kickback statute "explicitly includes a high scienter requirement," which "overcomes any potential vagueness in the statute because a person who would otherwise be ensnared without notice does not violate the statute.")

Here, the Indictment tracks the statutory language of the object Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(B), (b)(2)(b), including the requisite mens rea for a violation of the Anti-Kickback Statute—"knowingly and willfully." Ind. at ¶¶ 5-6. At trial, the United States will be required to prove Defendants knowingly and intentionally conspired to "knowingly and willfully" pay and receive kickbacks. But at this stage, Rule 7 requires no more to allow Defendants to build their defense. *See, e.g., United States v. Motamedi*, 2019 WL 5212991, at *2 (N.D. Cal. Oct. 16, 2019) (rejecting defendants attempt to "support their argument that the anti-kickback statutes are unconstitutionally vague without any citation to the statutory language, but rather with a conclusory statement that a reading of the safe harbor statute as well as the opinions and special fraud alerts issued by [OIG]" because "the anti-kickback statutes are not vague . . . and require 'knowing and willful' conduct, a requirement that mitigates any vagueness in the statutes.").

**D. The "Bona Fide Employment Relationships" Safe Harbor Provision of the Anti-Kickback Statute Is An Affirmative Defense, Not An Essential Element of The Indictment, and Does Not Render the Statute "Void for Vagueness."**

All Defendants argue that the Anti-Kickback Statute's bona fide employee safe harbor is void for vagueness and is also an element of the offense the United States has failed to allege. ECF No. 174 at 22-29; ECF No. 173 at 2-7, 9-15.

The Anti-Kickback Statute has various "safe harbors" that are protected from criminal liability under the Statute.  Because "of the broad reach of the [Anti-Kickback Statute], concern was expressed that some relatively innocuous commercial arrangements were covered by the statute and, therefore, potentially subject to criminal prosecution." *United States v. Blair*, 2021 WL 4339132, at *3 (D. Md. September 23, 2021) (citing Medicare and State Health Care Programs: Fraud and Abuse; Revisions to the Safe Harbors Under the Anti-Kickback Statute and Civil Monetary Penalty Rules Regarding Beneficiary Inducements, 81 Fed. Reg. 88368-01, 88368, 2016 WL 7103282 (Dec. 7, 2016).)  Accordingly, in 1987 Congress amended the fraud and abuse prohibitions of the Anti-Kickback Statute, *see* Pub. L. No. 100-93, and required the promulgation of regulations by HHS-OIG, specifying the payment practices that might be misconstrued as illegal remunerations under the statute, but would be protected from criminal liability under the amendment. These exceptions have become known as "safe harbors" and include safe harbors  in the Anti-Kickback Statute itself at 42 U.S.C. § 1320a-7b(b)(3) and safe harbors

established by regulation. *See* 42 C.F.R. § 1001.952 (regulation implementing the safe harbor provisions); *Shaw*, 106 F. Supp. 2d at 112.

Citing *Ruan v. United States*, 597 U.S. 450 (2022), Defendants argue that the bona fide employment safe harbor to the Anti-Kickback Statute is an essential element of the Anti-Kickback Statute and the United States must allege in the Indictment and prove beyond a reasonable doubt that the bona fide employment relationship safe harbor did not apply to defendants' conduct. Din argues that because the bona fide employee safe harbor is not plead in the Indictment, the Indictment must be dismissed. ECF No. 174 at 22-29.  Also citing *Ruan,* Aurangzeb argues that "[w]hen a statute includes an exception . . . the government must prove beyond a reasonable doubt that the exception does not apply."  ECF No. 173 at 2-7, 9-15. This argument makes no sense on its face:  the Anti-Kickback Statute includes a dozen safe harbors, 42 U.S.C. § 1320a-7b(b)(3)(B), and by Defendants' argument, the United States would have to allege in the Indictment and prove at trial that each and every safe harbor does not apply.  And the Defendants' arguments have been rejected by the various courts to have considered them and should be rejected here.

As the Supreme Court has stated, "[i]t has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses." *United States v. Sisson,* 399 U.S. 267, 288 (1970).  Courts routinely hold that the statutory exceptions to the Anti-Kickback Statute, and the safe harbor provisions promulgated in regulations, constitute affirmative defenses to an alleged violation of the Anti-Kickback Statute.  *See, e.g., United States v.*

24

*Hagen*, 60 F.4th 932, 947 (5th Cir. 2023); *United States v. George*, 900 F.3d 405, 413 (7th Cir. 2018); *United States v. Vernon*, 723 F.3d 1234, 1270-71 (11th Cir. 2013); *United States v. Yielding*, 657 F.3d 688, 700 (8th Cir. 2011); United *States v. Eggleston*, 823 F. App'x 340, 345-46 (6th Cir. 2020); *United States v. Turner*, 561 F. App'x 312, 319-20 (5th Cir. 2014); *United States v. Norton*, 17 F. App'x 98, 102 (4th Cir. 2001).

Consistent with that premise, courts have concluded that indictments charging violation of the Anti-Kickback Statute do not need to negate affirmative defenses.  For example, in *United States v. Crinel,* 2015 WL 3755896, at *3 (E.D. La. June 16, 2015), defendants charged with violating the Anti-Kickback Statute argued that the indictment was "facially deficient because it fail[ed] to negate, or affirmatively concede[], the applicability of the safe-harbor provision"—namely, the same bona fide employee safe harbor Defendants invoke in this case.  Noting that the defendants "ignore the signal importance of the safe-harbor provisions as an affirmative defense," the court held that "any challenge to the indictment based on the safe-harbor provisions fails as a matter of law." *Id.* at *4; *see also United States v. Davis,* 2014 WL 6679199, at *5 (S.D. Tex. Nov. 25, 2014) (finding that the safe-harbor defenses in the Anti-Kickback Statute "are affirmative defenses and that the Government is not under an obligation to anticipate and rule out every affirmative defense in its indictment"); *United States v. Novak*, 2014 WL 2937062, at *2-3 (N.D. Ill. June 30, 2014) (denying defendant's motion to dismiss because "[a]n indictment . . . is not required to anticipate affirmative defenses or negate

statutory exemptions," and stating that trial, "not a pretrial motion, is the place to contest" the applicability of the *bona fide* employee exception).

Defendants invoke *Ruan* to attempt to overcome this precedent. In *Ruan*, the Supreme Court considered, and overturned, two physicians' convictions under the Controlled Substance Act, which makes it a federal crime "*except as authorized . . .* for any person knowingly or intentionally . . . to manufacture, distribute, dispense . . . a controlled substance." *Id.* at 457 (citing 21 U.S.C. § 841). The Supreme Court held that "§ 841's 'knowingly and intentionally' *mens rea* applies to the 'except as authorized' clause"—meaning "once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.*

*Ruan* did not overturn the well-established rule that affirmative defenses do not need to be negated in the Indictment and does not control here. A court in this circuit has already rejected the argument that the Anti-Kickback Statute's safe harbors warrant the same treatment as the "except as authorized" clause in § 841 examined by the Supreme Court in *Ruan*. In *United States v. Valentino*, Crim. No. 20-309, ECF No. 199 (E.D. Pa. Sept. 7, 2022), Judge Schiller specifically addressed defendant's argument that, in light of *Ruan*, "the Safe Harbor provisions [of the Anti-Kickback Statute] are now an element of the statute the United States bears the burden of proving beyond a reasonable doubt." *Id.* The court rejected the argument, holding that "nothing in *Ruan* changes the treatment of the Anti-Kickback Statute's Personal Services

26

Safe Harbor as an affirmative defense." *Id.* at 2. Instead, the "Safe Harbor is an affirmative defense which Valentino bears the burden of proving." *Id.* at 3.

Under established legal principles, the Indictment need not include factual allegations that negate the existence of affirmative defenses such as the bona fide employee safe harbor. Defendants' motions to dismiss grounded in the bona fide employee safe harbor should be denied.

### E. The Indictment Sufficiently Alleges the Defendants Had the Requisite *Mens Rea*.

Aurangzeb argues that "[t]o properly allege a kickback violation, the government must allege (and prove at trial) that defendant Aurangzeb had the required intent, knowledge or awareness" that his conduct was illegal, but, "[o]ther than regurgitating the words 'knowingly and willfully' in the charging language, the indictment fails in this regard." ECF No. 173 at 7-9.

Even in his articulation of his argument, Aurangzeb improperly conflates what the Government bears the burden of proving *at trial* with what the Government must *allege* in the Indictment to defeat a Rule 12(b)(3)(B) motion. *See also id.* at 8 (citing *United States v. Goldman,* 607 Fed. App'x 171, 174 (3d Cir. 2015) (concluding that the district court properly instructed the *jury* that a willful violation of the Anti-Kickback Statute requires proof that the defendant "knew his conduct was unlawful and intended to do something the law forbids"))).

Aurangzeb is wrong. An indictment must contain only a "plain, concise and definite written statement of the essential facts constituting the offense

charged . . . ."  Fed. R. Crim. P. 7(c)(1).  As the Supreme Court has repeatedly recognized, it is ordinarily sufficient if an indictment "set[s] forth the offense in the words of the statute itself."  *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also Kemp*, 500 F.3d at 280 (holding an indictment suffices if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution").

Here, the Indictment tracks the statutory language of the federal conspiracy statute, 18 U.S.C. § 371, and the statutory language of the object statute, 42 U.S.C. § 1320a-7b(b)(1)(B), the Anti-Kickback Statute.  As Aurangzeb tacitly concedes, that language includes the requisite *mens rea* for a violation of the Anti-Kickback Statute—"knowingly and willfully."  Ind. ¶¶ 5-6. Rule 7 requires no more specificity to apprise Aurangzeb of the charge against him or permit him to build his defense and his motion should be denied.

   * * *

In sum, "[a] criminal statute need only give fair warning that certain conduct is prohibited."  *Hoffert*, 949 F.3d at 788 (citing *Ferriero*, 866 F.3d at 124).  "A defendant is deemed to have fair notice of an offense if the relevant statute defines the offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Blake*, 288 F. App'x at 793 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Defendants cite

no case—and the United States is not aware of any—finding the Anti-Kickback
Statute or the bona fide employee safe harbor affirmative defense
unconstitutionally vague.  The irrelevant OIG FAQ referenced by the
Defendants and the federal HRSA COVID-19 Uninsured Program likewise do
not render the straightforward Indictment in this case unconstitutionally
vague. The Court should therefore deny Defendants' motions to dismiss the
Indictment on all grounds.

**F. A De Minimis Incorrect Statutory Provision Does Not Warrant Dismissal of the Entire Indictment.**

The Indictment charged Defendants with conspiring to pay and receive
kickbacks for tests paid by a "Federal health care program," Ind. ¶ 2, which is
the phrase used in the Anti-Kickback Statute.  Din, joined by Syed, moves to
dismiss the entire Indictment because, when defining "Federal health care
program," the Indictment refers to an incorrect statute as well as the correct
statute. ECF No. 174 at 29-32. Specifically, when referring to "Federal health
care program," the Indictment cites the definition in 18 U.S.C. §§ 24(b) and
220(e)(3)—which define the term "health care benefit plan"—as well as the
correct definition found within the Anti-Kickback Statute itself, 42 U.S.C. §
1320a-7b(f). In the alternative, Din moves to strike any reference to the
incorrect statute from the Indictment.  The extraordinary remedy of dismissal
is unwarranted to address this citation error, and the Court should instead
grant the United States' forthcoming motion to correct the citation error in the
Indictment.

As the Indictment makes abundantly clear, Din has been charged with conspiring to violate the Anti-Kickback Statute, which makes it unlawful to "knowingly and willfully offer and pay any remuneration to any person . . . to induce such person . . . to recommend . . . ordering . . . any item, namely COVID-19 testing samples," and to solicit and receive remuneration in return for recommending any item "for which payment was made in whole or in part under a *Federal health care program* . . . ." Ind. ¶ 2(a), (b) (emphasis added).

Unlike the health care fraud statute, which covers fraud relating to a public or private "health care benefit program," 18 U.S.C. § 1347, the Anti-Kickback Statute criminalizes kickbacks only if they relating to  goods or services that may be covered by a *federal* health care program.  The term "Federal health care program" is referenced several times in the Indictment, and is referenced for the first time in paragraph 1(m):

> Medicare and the HRSA COVID-19 Uninsured Program each were "*Federal* health care programs" as defined in 42 U.S.C. § 1320a-7b(f) and "health care benefit programs" as defined in 18 U.S.C. §§ 24(b) and 220(e)(3).

Ind. ¶ 1(m) (emphasis added). The charging paragraphs also use the term "Federal health care program."

The definition of "Federal health care program" is found within the Anti-Kickback Statute itself at 42 U.S.C. § 1320a-7b(f), and that is the only statutory definition that should have been referenced in the Indictment. Accordingly, the first statutory cite in Indictment paragraph 1(m)—42 U.S.C. § 1320a-7b(f)—is correct.  But 18 U.S.C. §§ 24(b) and 220(e)(3) should not have been referenced in the Indictment because they contain the definition of

30

"health care benefit programs" not "*federal* health care programs." 18 U.S.C. §
24(b) is also incorrectly referenced in Indictment paragraphs 2(a), 2(b), and
paragraph 1 of the Forfeiture Allegation. In each of these paragraphs the
Indictment should have referenced only 42 U.S.C. § 1320a-7b(f), which
contains the definition for *Federal* health care programs. This was an
inadvertent citation error and the United States will move to amend it.

These citation errors do not affect the sufficiency of the Indictment. "[A]n
indictment is facially sufficient if it (1) contains the elements of the offense
intended to be charged, (2) sufficiently apprises the defendant of what he must
be prepared to meet, and (3) allows the defendant to show with accuracy to
what extent he may plead a former acquittal or conviction in the event of a
subsequent prosecution." *United States v. Stevenson*, 832 F.3d 412, 423 (3d
Cir. 2016) (citation omitted). Although the general rule is that an indictment
may only be amended by the grand jury, federal courts allow amendments
when "the change is merely a matter of form." *Russell v. United States*, 369 U.S.
749, 770 (1962). An amendment that is merely a matter of form is permissible
in situations where the indictment is "sufficiently detailed that there could
have been no confusion as to what the government alleged the defendants had
done." *United States v. Nelson*, 852 F.2d 706, 715 (3d Cir.1988); *see also United
States v. Miller*, 116 F.3d 641, 669–70 (2d Cir.1997) ("[T]he correction of merely
technical errors, such as typographical or clerical mistakes, is permissible
where it does not alter the essential substance of the charging terms."").
Changes of form include corrections of clerical or typographical errors, such as

citations to the wrong statute. *See United States v. Budd*, 496 F.3d 517, 534 n.3 (6th Cir. 2007) ("Of course, correction of a scrivener's error presents no problem."); *Short v. United States*, 471 F.3d 686, 693 (6th Cir. 2006) (explaining that "[c]ertain types of changes," including mere matters of form, "fall outside of the prohibition against amending an indictment"); *United States v. Lake*, 985 F.2d 265, 271 (6th Cir. 1993) (affirming amendment of an indictment at trial "since the court *merely corrected a typographical error in the citation of a statute*") (emphasis added). These corrections are allowed because they "d[o] not alter the essential substance of the charging terms" of the indictment and therefore do not jeopardize a defendant's constitutional protections, particularly fair notice of the charges. *See Miller*, 116 F.3d at 69–70.

Here, there is no question that the reference to 18 U.S.C. § 24(b) was a mere technical error.  The Indictment makes clear repeatedly and consistently that the Defendants are charged in a conspiracy to pay and receive kickbacks for COVID-19 test samples paid for under a *Federal* health care program, and not samples paid for by health care benefit programs more generally. *See* Ind. ¶¶ 1(i), 1(m), 2(a), 2(b), 3, and Forfeiture Allegation ¶ 1.  A decision within this circuit, *United States v. Evans*, 2021 WL 5279896 (E.D. Pa. Nov. 12, 2021), is instructive.  In *Evans*, the court granted the United States' motion to correct clerical errors in three statutory citations in a superseding indictment.  *Id.*  The court granted the government's motion to correct the statute governing the violations charged in counts 2 and 3 because the correction "limit[ed] the scope of the charged criminal conduct" and also granted the government's motion to

correct a statutory cite in count 5—which expanded the conduct charged—because the amendment "corrects an inadvertent error" and "will not prejudice the defendant since the Indictment fully apprises him of the nature of the crime charged and the need to prepare a defense." *Id.* at *5; *see also United States v. Karmue*, 841 F.3d 24, 30 (5th Cir. 2016) (holding post-trial correction of superseding indictment was not reversible error in part because "[defendant's] counsel had notice of the correct citation well before trial").

Din cites the 125-year-old decision, *Keck v. United States*, 172 U.S. 434 (1899), in support of his motion to dismiss the Indictment because of this citation error, but *Keck* is inapposite. *Keck* was a post-trial decision, and the Court ultimately overturned Keck's conviction because the indictment did not sufficiently inform Keck of the nature of the accusations against him. Here, the Indictment makes clear that the Defendants have been charged in a conspiracy to pay and receive kickbacks for COVID-19 tests that are covered by *federal* health care programs. Long before trial, Defendants have been made aware of the correct statutory citation and of the citation error in the Indictment. The United States will move to replace any reference to 18 U.S.C. §§ 24(b) and 220(e)(3) with 42 U.S.C. § 1320a-7b(f), thereby narrowing the scope of the Indictment to only COVID-19 tests covered by *Federal* health care programs. There is no confusion as to what crime the Defendants are alleged to have committed, and the Court should deny his motion to dismiss the Indictment on these grounds.

33

**II.    THE DRASTIC REMEDY OF SEVERANCE IS NOT WARRANTED**

All Defendants move to sever the trial of Aurangzeb from the trial of Din and Syed.   Aurangzeb moves to sever on the ground that there is a "gross disparity" in the amount of evidence against Syed and Din, as compared with him, making a joint trial "highly prejudicial."  ECF No. 173 at 15-17.  Din moves for severance because, he claims, the Government intends to introduce Aurangzeb's post-arrest statement at trial "without redaction," which contravenes *Bruton v. United States*, 391 U.S. 123 (1968).  ECF No. 169 at 19-21. None of these arguments satisfy the heavy burden necessary to justify the drastic remedy of severance.

The decision as to whether to grant severance "is committed to the sound discretion of the trial judge," who must balance the risk of prejudice against the "public interest in joint trials" and the need to preserve judicial and prosecutorial resources. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) (citation omitted); *see United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992). Given the "fundamental principle that the federal system prefers 'joint trial of defendants who are indicted together' because joint trials 'promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts,'" *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 537-39 (1993)), the defendant bears the "heavy burden" of demonstrating that the denial of severance would lead to "clear

and substantial prejudice resulting in a manifestly unfair trial." *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005).

Rule 14 permits severance where "the joinder of offenses . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a *specific* trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539 (emphasis added). Mere allegations of prejudice or a defendant's claim that he is more likely to be acquitted if tried separately are insufficient to justify severance. *Urban*, 404 F.3d at 775-76.

The preference for joint trials is especially strong where the defendants are charged in the same conspiracy. Such joint trials protect the Government's case from premature disclosure, while also "aid[ing] the finder of fact in determining the 'full extent of the conspiracy.'" *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (quoting *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982)); *see United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991) (as it is "customary" to try co-conspirators together, severance justified "only for compelling reasons"). Furthermore, as "acts committed by one [co-conspirator] in furtherance of the conspiracy [would be] admissible against the other" co-conspirator in a separate trial, severance would serve little to no purpose except to waste public resources. *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001); *see United States v. DePeri*, 778 F.2d 963, 984 (3d Cir. 1985) ("[P]ublic resources . . . would be lost if the same evidence were presented at separate

trials."); *see also United States v. Boyd*, 180 F.3d 967, 982-83 (8th Cir. 1999) (joint trial cannot constitute prejudice, as evidence would have been admissible in separate trials under Rule 404(b)); *United States v. Valentine*, 984 F.2d 906, 910-11 (8th Cir. 1993).   Finally, the fact that evidence against one defendant may be stronger than that against another does not entitle a defendant to severance, *see Zafiro*, 506 U.S. at 539 (even where there is risk of some prejudice, district court can tailor a "less drastic" remedy, such as use of limiting instructions); *Lore*, 430 F.3d at 205; *United States v. Somers*, 496 F.2d 723, 730 (3d Cir. 1974).

**A. Spillover Prejudice, If Any, Does Not Justify Severance of Aurangzeb**

Aurangzeb argues that severance is warranted due to a "gross disparity" in the evidence to be presented at trial against him, as compared with his co-defendants, Syed and Din.  ECF No. 173 at 15-17.  Specifically, he argues that there is a "substantial risk that the evidence against [Syed and Din] will spill over to" Aurangzeb, who is (i) mentioned less frequently in the Indictment, (ii) appears infrequently in the undercover recordings, and (iii) profited modestly for his participation in the scheme (approximately $118,662.70) as compared with the $3.5 million in illicit reimbursements that Syed and Din received from federal health care programs.  *Id.*

Although it is true that Syed and Din profited more than Aurangzeb, he dramatically overstates the imbalance of evidence.  At trial, the Government will present evidence about the kickback conspiracy, which Aurangzab was a significant part of.  As stated in the Indictment, Syed and Din were the owners

of Metpath, and Weathers and Aurangzeb were "marketers" who received kickbacks on a per-sample basis for inducing the referral of COVID-19 test samples to Metpath. Indictment at ¶¶ 6, 9. At trial, the Government will show how the kickback conspiracy functioned by relying on "marketers" like Aurangzeb to direct test samples to MetPath. The Government will also establish that Aurangzeb personally caused approximately 502 COVID-19 test samples to be referred to Metpath and that he was paid a kickback for each of them by Syed and Din. *Id.* In total he was paid kickbacks of approximately $118,662.70 and caused a loss of more than $500,000 from federal health care payors.

Additionally, the evidence against Syed, Din, and Aurangzeb will substantially overlap at trial. For example, the same set of lay, expert, and law enforcement witnesses will testify against all three individuals, and the Government will largely rely on the same set of recordings, claims data, and other documents. Indeed, Aurangzeb does not identify a single piece of evidence that would be admissible against Syed and Din but not him. This is not surprising given that "acts committed by one [co-conspirator] in furtherance of the conspiracy [would be] admissible against the other." *See Hart*, 273 F.3d at 370; *United States v. Spicer*, 2013 WL 871952, at *3 (E.D.N.Y. Mar. 7, 2013) ("Evidence adduced against one alleged coconspirator is 'neither spillover nor prejudicial' if it would be admissible at a separate trial against the movant as an act of a co-conspirator in furtherance of a conspiracy due to the nature of conspiratorial illegal activity."); *United States v. Lindauer*, No. 03-CR-807, 2004 WL 2813168, at *3 (S.D.N.Y. Dec. 6, 2004) ("Because proof of the full nature and scope of a

37

conspiracy is admissible even at the trial of lesser participants, a defendant cannot claim improperly prejudicial spillover from the introduction of such proof.") (citation omitted).

Accordingly, while Syed and Din, as the owners of Metpath and payor of the kickbacks, played more significant roles than Aurangzeb in the kickback conspiracy, there is no "gross disparity" between them as to either the type or amount of evidence to be presented at trial, and "[a] joint trial will aid the finder of fact in determining the full extent of [the kickback conspiracy]." *United States v. Malik*, 2009 WL 1922257, at *8 (E.D. Pa. July 2, 2009) (denying severance where the defendants were "indicted together . . . in a single charge of conspiracy" and "are alleged to have participated in the same series of acts that constitute naturalization fraud").

Moreover, even if the disparity Aurangzeb complains of were true, the Third Circuit and other courts have uniformly held that defendants are not entitled to severance merely because evidence against defendants is more voluminous or more damaging. *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986) ("Participants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another."); *Eufrasio*, 935 F.2d at 568 ("Neither a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable defendants to severance."); *Urban*, 404 F.3d at 776 (affirming denial of severance for defendant even though potentially more evidence against co-defendants because jury could

38

compartmentalize the evidence); *Lore*, 430 F.3d at 205 (same); *see also United States v. Potashnik*, 2008 WL 5272807 *7 (N.D. Tex. Dec. 17, 2008) (holding a "quantitative disparity in the evidence is clearly insufficient in itself to justify severance") (citation and quotation marks omitted); *see also United States v. Crinel*, 2016 WL 3877976, at *7 (E.D. La. July 18, 2016) (noting it is "well accepted that a quantitative disparity in the evidence against a particular defendant is not sufficient grounds to justify severance"); *United States v. Ferrarini*, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) ("[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role.") (citing *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991)).

Moreover, to the extent that Aurangzeb has specific concerns about the admissibility and potential undue prejudice of particular pieces of evidence at trial, such concerns may be addressed in forthcoming motions *in limine* before trial.  *See Spicer*, 2013 WL 871952, at *4 (noting that "denying [a defendant's] motion to sever does not obviate his ability to seek exclusion of any [potentially prejudicial evidence] at trial pursuant to Rule 403").

Even though almost all of the trial evidence will be admissible against all three defendants, where certain evidence applies to some but not all defendants, the court can cure any prejudice through limiting instructions to the jury.  Given the presumption that the jury follows such instructions, *Zafiro*, 506 U.S. at 540, there would be little risk of spill-over prejudice, *see United States v. Savage*, 2012 WL 6609425, at *9 (E.D. Pa. Dec. 19, 2012), *aff'd* 85 F.4th 102 (3d Cir. 2023)

(denying severance where co-defendant "offered only conclusory assertions and hypothetical situations" as to the risk of spillover prejudice and "failed to demonstrate that a jury will be unable to separate the evidence and apply it only to the specific Defendants against whom it is offered").

Finally, a separate trial for Aurangzeb would needlessly waste judicial and prosecutorial resources because it would involve two trials with almost entirely overlapping evidence, including duplicate testimony from the same set of witnesses and substantially the same documentary evidence and recordings. Because "acts committed by one [co-conspirator] in furtherance of the conspiracy [would be] admissible against the other" co-conspirator in a separate trial, *Hart*, 273 F.3d at 370, severance would serve little to no purpose except to waste public resources. *See DePeri*, 778 F.2d at 984 ("[P]ublic resources . . . would be lost if the same evidence were presented at separate trials."). Thus, "the recognized public policy in favor of joint trials of alleged co-conspirators" readily applies here, and Aurangzeb has not come close to meeting his burden to justify deviation from the "general rule." *United States v. Thompson*, 219 F. Supp. 3d 502, 516 (M.D. Pa. 2016) (quoting *United States v. Console*, 13 F.3d 641, 655 (3d Cir. 1993)).

Additionally, because of the overlap in evidence and witness testimony, severance would create a "tactical disadvantage to the government from

disclosure of its case" to whichever of Aurangzeb or Syed and Din were tried second.  *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981).

### B. Severance of Aurangzeb Under *Bruton* would be Premature

Din and Syed assert that *Bruton* mandates that Aurangzeb's trial be severed from that of his co-defendants because the Government "intends to utilize, at trial, Aurangzeb's post-arrest oral statement" implicating his co-defendants in the kickback conspiracy "without redaction," which would jeopardize their Sixth Amendment rights to confront adverse witnesses. ECF No. 169 at 19-21. This concern, however, is entirely speculative. The Government has not yet decided—much less told defendants—that it intends to introduce Aurangzeb's entire unredacted post-arrest statement at trial. To the contrary, at the appropriate time the Government will propose to Defendants a redacted version of Aurangzeb's statement that comports with *Bruton* and its progeny. *See United States v. Johnson*, 2022 WL 2953905, at *10 & n.5 (W.D. Pa. July 26, 2022) (denying severance on *Bruton* grounds in part because "any potential Sixth Amendment problems can be appropriately resolved at a point closer to trial, most likely through motions *in limine"*).  Severance on this basis thus would be premature, and the Court should deny the motion without prejudice.[5]

---

[5] Aurangzeb also argues that a hearing is necessary to determine whether statements made by his co-conspirators are admissible against him, pursuant to Federal Rule of Evidence 801(d)(2)(E). ECF No. 173 at 17. Given that no trial date has been set and the United States has not identified which co-conspirator statements it intends to introduce, Aurangzeb's motion for a hearing is premature and should be denied without prejudice.

III    **THE COURT SHOULD DISMISS DEFENDANTS' REMAINING OMNIBUS MOTIONS BECAUSE THEY ARE WITHOUT MERIT OR PREMATURE.**

A. **Defendants' Request For A Hearing To Determine Which Co-Conspirator Recordings Should Be Admitted at Trial Is Premature.**

Din, joined by Syed, argues that a hearing is necessary to determine the admissibility of the recordings made by the confidential witness ("CW") and of Aurangzeb in this case because (i) the CW recordings are "largely unintelligible," (ii) the CW recordings appear to have been "altered," (iii) the United States has improperly withheld one CW recording, and (iv) and the post-arrest statement of Aurangzeb was improperly "patched together." ECF No. 169 at 12-19.  Aurangzeb requests a hearing to determine the audibility and clarity of all recordings and to ensure the United States establishes a proper foundation before introducing them.  ECF No. 173 at 23-24.

The Court should dismiss without prejudice these requests for a ruling on the admissibility at trial of all these recordings because the United States has not yet identified which of the dozens of CW recordings—or the portions of those recordings—it will move to admit at trial. This is not a discovery issue—the United States has produced all relevant recordings in their original format. Accordingly, defendants' arguments are without merit and premature, and a hearing on the audibility and admissibility of the recordings is unnecessary at this time.

Instead, the United States respectfully requests that the Court incorporate into the trial scheduling order a date by when the United States

42

will identify the recordings it intends to introduce at trial and the date for a hearing regarding their admissibility, if contested.  Nevertheless, the United States responds to each of Din's arguments about the recordings below.

### 1. The CW Recordings are Largely Audible.

First, Din asks the Court to find the recordings inadmissible because he alleges that that a few seconds of recordings by the CW—among over 30 *hours* of recordings that were produced to defense—are inaudible. ECF No. 169 at 12-15. The vast majority of the recordings are audible, and the United States has produced over 58 pages of transcripts and will produce transcripts for any recordings it intends to introduce at trial in advance of trial.

The law does not support Din's request to exclude the recordings. "It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir.1983). In order to be admissible, the district court must determine whether the tapes are "audible and sufficiently comprehensible for the jury to consider the contents." *Robinson*, 707 F.2d at 876. The district court abuses its discretion only "where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy." *United States v. Scaife*, 749 F.2d 338, 345 (6th Cir. 1984).

In *United States v. Aragon-Hernandez*, 2007 WL 315351 (N.D. Iowa Jan. 31, 2007), the court granted defendant's motion to exclude certain recordings because "little more than isolated phrases, words, or brief exchanges could be clearly understood in any of the recorded conversations . . . the recordings were

43

marred by constant electronic or other noise, possibly from the recording device, that was so loud as frequently to overwhelm the conversation . . . the volume of the speakers' voices varies dramatically, rendering some comments so soft as to be indiscernible, and others so loud as to be distorted . . . [and] that one of the speakers had such difficulty hearing the statements of the other that he frequently asked the other to repeat himself."  As a result, the court held that the tapes "in their entirety" provide few intelligible comments or exchanges so isolated from each other as to make the conversations incoherent and confusing. *Id.* at *2.

The recordings by the CW in this case are not suffering from the same audibility issues as the ones identified by the *Aragon-Hernandez* court, and the United States will make any recordings it intends to introduce at trial available to the Court should a hearing on their audibility be necessary.   Indeed, even if some portions of the tapes are inaudible, this does not render them inadmissible. *See, e.g., United States v. Nicholson*, 815 F.2d 61, 63 (8th Cir.1987) (even though trial judge stated the tapes were the "worst tapes he had ever heard," no reversible error in admission of tape recording with substantial inaudible portions because "parties had the opportunity to argue to the jury their versions of what was contained on the inaudible portions" and "inaudibility of portions of the tapes did not render them untrustworthy as a whole").

### 2. The CW Recordings Have Not Been Altered.

Second, Din argues that the CW recordings appear to have been "altered" by the United States prior to production because "oftentimes the beginning and/or end of certain recordings are missing." ECF No. 169 at 15-16. As the United States has informed Din, the United States did not alter the CW recordings in any way prior to their production. The recordings were produced as they were recorded without any redaction or omission. Because the FBI Special Agent who managed the CW's recording device was not with the CW and instead turned the CW's recording device on and off remotely, the recordings may not capture the beginning and end of all conversations—particularly irrelevant conversations—but this does not mean the recordings were altered. Law enforcement will testify to such should a hearing on the admissibility of the recordings be necessary.

### 3. All Relevant Recordings Have Been Produced Pursuant to Rule 16 and the Court Should Not Order the United States to Produce an Irrelevant Recording.

Third, Din argues that the United States refused to produce a recording by the CW because the information revealed the identity of a confidential human source. ECF No. 169 at 16-18. This is incorrect. The United States has already produced numerous CW recordings and is not withholding any recordings to protect the identity of a confidential witness. Din specifically requests this "withheld" recording because he received in discovery an FBI report indicating that a recording exists between CW-1, Syed, and a third party from January 19, 2022. A recording was made by CW-1 on

January 19, 2022, but it relates to an unrelated investigation and involves entirely different individuals.  When FBI noticed the error in the FBI report, it immediately filed a report correcting the error, and that report has been provided to all Defendants.   To the extent the irrelevant recording by the CW constitutes *Jencks*, the United States will comply with its *Jencks* and *Giglio* obligations and produce the recording in accordance with the forthcoming trial scheduling order. Should the Court desire, the United States will play the irrelevant recording for the Court *in camera* so the Court can determine for itself whether it is relevant to this case.

### 4. The Recording of Muhammed Aurangzeb's Post-Arrest Statement Has Not Been Altered.

Finally, Din argues that the United States should be sanctioned for failing to maintain a complete uninterrupted recording of Aurangzeb's post-arrest statement and requests that the Court conduct a hearing to determine whether Aurangzeb's post-arrest statement is admissible.  ECF No. 169 at 18-19.  After his arrest in this case, Aurangzeb gave a nearly-three-hour-long recorded statement to law enforcement.  Din argues that the government has refused to produce a complete uninterrupted recording of Aurangzeb's post-arrest statement.  This is incorrect. The unaltered original recording of Aurangzeb's statement was produced to all defendants last year, and it was produced as it was recorded by and received from FBI.  As the United States has explained to Din, FBI's recording equipment recorded the interview in clips, and all of those clips were produced to defendants. At Din's

46

request, the United States also combined those clips into one consolidated recording of Aurangzeb's statement and produced that recording to the defense. The United States did not fail to maintain a complete recording of Aurangzeb's post-arrest statement. Din's request for a hearing and sanctions should be denied. As discussed herein, the United States has not yet identified which portions of Aurangzeb's statement it intends to introduce in accordance with *Bruton*, so any hearing on the recording's admissibility would be premature.

### B. Defendants' Request for a Bill of Particulars Should Be Denied Because Defendants Have Received a Detailed Indictment and Extensive Discovery.

Din, joined by Syed, requests a bill of particulars that (1) matches each alleged kickback that the United States will seek to prove at trial to a claim submitted to and/or paid for by a federal health care program, ECF No. 169 at 23-27, and (2) identifies the "others" with whom Din conspired, ECF No. 169 at 28-30. In light of the detail in the Indictment and the significant amount of information produced in discovery, as well as for the other reasons discussed below, the motion should be denied.

Din seeks far more than the law permits. A bill of particulars is required only when an indictment is too vague to permit the defendant to understand the charges and prepare a defense, avoid unfair surprise, and assert a claim of double jeopardy where appropriate. *United States v. Urban*, 404 F.3d 754, 771-72 (3d Cir. 2005). "Only where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense

47

or is likely to lead to prejudicial surprise at trial[,]' will we find that a bill of particulars should have been issued." *Id.* (citations omitted).  If the indictment enables the defendant to understand the accusations against him and the central facts the Government will present at trial, a bill of particulars is unwarranted.  *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, [but] is instead intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his own investigation." *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985); *see also United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003).  And courts have "declined to require the Government to answer a set of detailed interrogatories in the guise of a bill of particulars." *United States v. Kenny*, 462 F.2d 1205, 1212 (3d Cir. 1972).

As discussed herein, here, the Indictment is highly detailed and does much more than merely track the statutory language.  After identifying the named conspirators—Syed, Din, Weathers and Aurangzeb—as well as one

48

other uncharged co-conspirator (Individual-1), the Indictment details the COVID-19 sample kickback conspiracy in 26 paragraphs.  Indictment ¶¶ 1-26. The Indictment begins with an explanation of how patients' COVID-19 samples are sent to laboratories (like Metpath) in order for laboratories to test the samples to determine whether a patient has been infected with COVID-19. *Id.* ¶ 1(g). The Indictment explains that, once a laboratory receives and tests a sample, a laboratory submits a claim for reimbursement to the patient's insurance carrier— such as Medicare, which provides health insurance benefits for certain individuals, including the elderly.  *Id.* ¶ 1(g)-(i).  The Indictment also explains that, during the COVID-19 pandemic, a federal agency within the U.S. Department of Health and Human Services called the Health Resources and Services Administration ("HRSA") gave reimbursements to health care providers who provided certain services to uninsured individuals (the "HRSA COVID-19 Uninsured Program").  *Id.* ¶ 1(j), (l). In five subparagraphs, the Indictment explains the various parts of COVID-19-related federal legislation that funded the HRSA COVID-19 Uninsured program, *id.* ¶ 1(k)(i)-(v), and explains that both the HRSA COVID-19 Uninsured Program and Medicare are federal health care programs, *id.* ¶ 1(m).

After the charging paragraphs, the Indictment then describes the manner and means by which Syed and Din operated and controlled Metpath and paid "marketers"—including Weathers, Aurangzeb, and Individual-1—kickbacks in order to induce them to refer COVID-19 test samples to Metpath.  *Id.* ¶¶ 4-25. These paragraphs explain how, beginning in approximately April 2021, Din and

Syed paid Individual-1 approximately $25 for every COVID-19 sample he directed to Metpath and Individual-1 received checks calculated by the total number of samples he referred to Metpath each month.  *Id.* ¶¶ 6-11.  The Indictment also explains how Syed added a few "extra cents" to one of Individual-1's checks in order to make it appear as if Individual-1 was a "consultant" for Metpath with legitimate business expenses.  *Id.* ¶ 12.  The Indictment goes on to also explain how Weathers received approximately $30 per COVID-19 test sample and how Aurangzeb received between $5 - $20 for each COVID-19 test sample referred to Metpath, and gives numerous examples of kickback payments they received.  *Id.* ¶¶ 13-23.  Finally, the Indictment explains that Metpath received over $3.5 million in reimbursements for these COVID-19 tests from the HRSA Uninsured Program and Medicare.  *Id.* ¶ 25. "[T]he specificity with which" the Indictment identifies the time period, events, and transactions at issue make it "highly unlikely" that defendants might be "unfairly surprised with . . . unfamiliar" allegations at trial.  *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012).

The Third Circuit has emphasized that a bill of particulars is unnecessary in those cases where, as here, the Government supplements a detailed charging document with substantial discovery.  *Urban*, 404 F.3d at 772; *see also United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars). Where, as here, "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines."  *United States v.*

50

*Caruso*, 948 F. Supp. 382, 393 (D.N.J. 1996); *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (extensive discovery "must have answered a great many, if not all, of defendants' requests" for discovery and a bill of particulars).

Discovery in this case has been extensive and "provided in an organized and comprehensible fashion." *United States v. Skelos*, Crim. No. 15-317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015). Defendants here have received extensive information in discovery in this case, including over 60,000 pages of documents, over 30 hours' worth of undercover recordings, and claims data for COVID-19 test samples reimbursements Metpath submitted to Medicare and the HRSA COVID-19 Uninsured Program. The Government has included cover letters with each production that organized these documents by producing party and includes other descriptive detail for each range of bates stamps it has produced. The defendants began receiving discovery from the Government over a year ago in or around May 2023, and defendants have possessed for months audio and documentary evidence that will be used by the Government at trial. The defendants therefore have "'that minimum amount of information necessary'" for their "'own investigation'" such that "there is no need to order the bill of particulars requested by Defendant[s]." *United States v. Grasso*, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (quoting Smith, 776 F.2d at 1111).

Given the detailed Indictment and the extensive discovery, a bill of particulars is not only unnecessary, it may have a detrimental effect on the Government's proofs. A bill of particulars "effectively narrows the government's

case at trial in the same way as the formal charging document: 'there can be no variance between the notice given in a bill of particulars and the evidence at trial.'" *N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 429 (3d Cir. 2016) (quoting *Smith*, 776 F.2d at 1111).  As a result, district courts are understandably reluctant at the pretrial stage to "unduly freeze [the government] to its proofs at trial." *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980).

In considering whether to grant a bill of particulars, a court also must weigh the burden on the Government, "the government's interest in not being forced to divulge the entirety of its case prior to trial," *Zolp*, 659 F. Supp. at 706, and "the unfairness that can result from forcing the government to commit itself to a specific version of the facts."  *Rosa*, 891 F.2d 1066.

The Indictment and extensive discovery here thus clearly "contain[] sufficient factual and legal information for the defense to prepare its case." *United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003); *see also United States v. Atwell*, Crim. No. 13-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) (Wolfson, J.) ("[D]iscovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars."). Presumably based on current practices of providing detailed indictments and extensive discovery before trial, Judge Hillman concluded: "'The current case law does not favor granting motions for bills of particulars.'"

*United States v. Lacerda*, 2013 WL 3177814 at *14 (D.N.J. June 19, 2013)

(quoting *United States v. Kemp*, 2004 WL 2757867 (E.D. Pa. Dec. 2, 2004)).[6]

Each defendant therefore has more than "that minimum amount of information

necessary to permit the defendant to conduct his *own* investigation," *Smith*,

776 F.2d at 1111, and a bill of particulars is unwarranted.

### 1. Defendants' Individual Requests

Although it is obvious that Din's individual requests go beyond what is

required to be disclosed in a bill of particulars, the United States responds

below to each request in turn.

### a. The Alleged Kickbacks

Din requests a bill of particulars identifying "all payments [the

Government] alleges violate the AKS, and the insurance claims to which each

payment is tied." ECF No 169 at 27. There is no legal support for Din's request,

and it should be denied. The Third Circuit has held that the Government need

not provide a bill of particulars detailing each and every act taken by a

defendant in a fraudulent scheme.  In *Moyer*, the court explained that the

government is not required to "identify every omission or inclusion that

rendered false the documents identified in the indictment" or "'at the pre-trial

stage, weave the information at its command into the warp of a fully integrated

trial theory for the benefit of the defendant.'"  674 F.3d at 203 (citation

---

[6] To the extent Din relies on the advisory committee's comment that Rule 7 was amended to encourage a more liberal attitude towards bills of particulars, *see* ECF No. 169 at 22, that comment was made in 1966, and federal indictments and discovery practices have changed greatly in the past 50+ years.

omitted).  Many other courts have denied bills of particulars seeking a list of details about fraudulent schemes.  In *Lacerda*, for example, Judge Hillman denied a request to identify the specific misrepresentations in a fraud case, finding that the indictment detailed numerous false representations and that "the Government should not be required to disclose the specific information related to Defendants' alleged misrepresentations."  2013 WL 3177814 at *15; s*ee also United States v. Delle Donna,* 552 F. Supp. 2d 475, 498 (D.N.J. 2008) (declining to order bill of particulars seeking particulars of mail fraud theory: "the bill is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Sourlis*, 963 F. Supp. at 579-80 (rejecting request for bill of particulars seeking details about misrepresentations); *United States v. Knight*, 2013 WL 3367259, at *4 (E.D. Pa. July 3, 2013) (rejecting request for bill of particulars identifying specific material deceptions by defendant); *United States v. Qayyum*, 1998 WL 159056, *3 (S.D.N.Y. Apr. 1, 1998) (denying request for bill of particulars identifying which of approximately 900 pharmaceutical prescriptions turned over in discovery were alleged to be fraudulent).

The Indictment and discovery give Din ample information about the fraud scheme to prepare for trial.  As the Indictment clearly explains, Din is alleged to have violated the Anti-Kickback Statute by paying kickbacks to marketers for COVID-19 tests that were paid for in whole or in part by a Federal health care program—"namely, Medicare and the HRSA COVID-19 Uninsured Program."  Indictment ¶ 2(a).  Over a year ago, the United States

produced claims data for claims that Syed and Din, through Metpath,

submitted to Medicare and the COVID-19 Uninsured Program for

reimbursement.  This data is highly detailed and includes the amount Metpath

claimed and the amount Metpath received from Medicare and the COVID-19

Uninsured Program for each claim that Metpath submitted for reimbursement

for COVID-19 samples it tested.  The claims data also includes the provider

who performed each COVID-19 test that was submitted to Metpath.  Even

though the United States is not required to tie each claim to a specific kickback

payment, the United States will identify for Defendants the bates ranges for the

produced documents that list the names of the providers from whom marketers

Weathers, Aurangzeb, and Individual-1 collected COVID-19 samples and

directed to Metpath.

Din cites no law that requires more.  The only case Din cites that

involves a violation of the Anti-Kickback Statute is an unreported decision from

the Southern District of Texas—*United States v. Davis*, 2014 WL 6679199, at *6

(S.D. Tex. Nov. 25, 2014).  Davis was charged with violating the Anti-Kickback

Statute by receiving kickbacks for referring the Medicare beneficiaries who

were housed at her personal care home to an outpatient center.  *Id.* at *2.  In

*Davis*, the court ordered the United States to provide a bill of particulars

identifying the names of the Medicare beneficiaries in her personal home care

facility whose claims were tainted by any alleged illegal kickback.  *Id.* at *4.

Given the Medicare beneficiaries were clients of Davis's personal care home,

this clearly involved a finite number of beneficiaries, which is clearly

55

distinguishable from this case, which involved thousands of COVID-19 samples. Most importantly, the Court did *not* order the United States to provide a bill of particulars listing each and every claim violating the Anti-Kickback statute. The other cases Din cites fare no better. *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), does not involve an Anti-Kickback violation and, unlike Din's request for "all" payments that allegedly violate the AKS and all corresponding insurance claims, the court only granted Nachamie's request for a bill of particulars "with regard to those claims that the Government intends to prove at trial." *Id.* The remaining cases cited by Din pertain to violations of the Taft-Harley Act, bribery charges, and health care fraud. No other case involves violations of the Anti-Kickback Sstatute, and the United States is unaware of any case that requires the United States to do what Din requests. Din's request to compel the Government to match each and every kickback payment to a claim submitted to a federal health care program is far beyond what the law requires, is not supported by any case law, and should be denied.

### b. The Other Co-Conspirators

Din also requests a bill of particulars listing the "others" with whom Din conspired. ECF No. 169 at 28-30. Defendants have no shortage of information about unindicted persons who conspired with Din and others to solicit and/or receive kickbacks in exchange for COVID-19 test samples directed to Metpath: Din has received numerous recordings of Individual-1, who is included in the Indictment, and Din knows that David Weathers, who was charged in the

56

indictment, and Tauqir Khan, who was charged in the original complaint, have both pled guilty to conspiring with Din and Syed to violate the Anti-Kickback Statute and are awaiting sentencing.  What Din really wants is not to find out who was involved in their conspiracy—because they have that information in great detail from the discovery—but to obtain the Government's position about the status of other individuals who played a role in the events in this case, including four individuals who were charged in the initial complaint in this case but not named in the Indictment.

The law does not require such information in a bill of particulars.  "It is well settled that courts are 'highly reluctant to require a bill of particulars when defendants have asked for specific identities of coconspirators.'" *United States v. Smukler*, 330 F. Supp. 3d 1050, 1066 (E.D. Pa. 2018) (citation omitted). "Particularly where discovery, as in this case, has been extensive, identification of coconspirators is not required." *United States v. Coburn*, 39 F. Supp. 3d 361, 383 (D.N.J. 2020) (citing *United States v. Torres*, 901 F.2d 205, 233–34 (2d Cir. 1990). One court specifically declined the defendants' request "to require the government to make legal conclusions as to numerous individuals who were peripherally involved in this matter." *United States v. Mariani*, 7 F. Supp. 2d 556, 560-61 (M.D. Pa. 1998).  Numerous other courts in this circuit have denied requests that the government identify unindicted co-conspirators or persons identified as "others" in the indictment.  *See, e.g., United States v. Cook*, 2018 WL 1744682, at *2 (M.D. Pa. April 11, 2018); *United States v. Atwell*, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015); *United States v. Depiro*,

2013 WL 663303, at *5 (D.N.J. Feb. 20, 2013) (declining request for "the

identify of all unindicted co-conspirators and aiders and abettors"); *Knight*,

2013 WL 3367259, at *4-5 (rejecting request to identify co-conspirators and

persons identified as "others" in the indictment); *Delle Donna*, 552 F. Supp. 2d

at 498 (declining request for bill of particulars identifying all persons who

participated in the offenses); *United States v. Sampson*, 2012 WL 214707, at *3

(M.D. Pa. Jan. 24, 2012) (denying request because defendant had witness

interviews and plea agreements of several co-conspirators); *see also United

States v. Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005) ("Courts have been

highly reluctant to require a bill of particulars when defendants have asked for

specific identities of co-conspirators or others involved."). This request should

be denied as well.

    The majority of cases cited by Din in which courts granted requests for

bills of particular naming co-conspirators are largely from outside this circuit.

Those decisions turned on the particular facts of those cases, including the

nature of the case and the extent of information provided in the indictment and

discovery. The cases cited above show that, at least in this circuit, when

extensive discovery has been provided, as it has been here, courts have not

required identification of unindicted co-conspirators.

    In sum, the Indictment and extensive discovery here "contain[] sufficient

factual and legal information for the defense to prepare its case." *United States

v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003). Defendants have enough

information to prepare for trial and the requests for a bill of particulars should be denied.

### C. Din's Motion to Strike Surplusage from the Indictment Should Be Denied.

Din, joined by Syed, moves pursuant to Fed. R. Crim. P. 7(d) to strike as irrelevant surplusage the Indictment's allegation that Din conspired with "others" if, in fact, there are not "others" with whom Din conspired, ECF No. 169 at 31-32, and moves to strike reference to the word "kickback" if the United States cannot tie each kickback payment referenced in the indictment to a claim submitted to a federal health care program, *id.* at 32-34. The motions should be denied.

Federal Rule of Criminal Procedure 7(d) permits a court, on motion of the defendant, to strike surplusage from an indictment only if such surplusage is *both* irrelevant to the offenses charged *and* prejudicial to the defendant. *See United States v. Hedgepeth*, 434 F.3d 609, 611 (3d Cir. 2006). Such motions are rarely granted. *See id.* This is because an indictment is not limited to a bare recitation of the essential elements of the charged offense. Rather, it may contain other language that is "relevant in a general sense to the overall scheme alleged in the indictment," as well as language "relevant to evidence that the government will present at trial." *United States v. Caruso*, 948 F. Supp. 382, 392 (D.N.J. 1996); *see also United States v. Giampa*, 904 F. Supp. 235, 271-72 (D.N.J. 1995). Thus, "the scope of a district court's discretion to strike material from an indictment is narrow." *United States v. Oakar*, 111

F.3d 146, 157 (D.C. Cir. 1997); *see also United States v. Pharis*, 298 F.3d 228, 248 (3d Cir. 2002) (Cowen, J., dissenting) (quoting same).

Motions to strike allegations as surplusage are evaluated under an "exacting standard," *United States v. Alsugair*, 256 F. Supp.2d 306, 317 (D.N.J. 2003), and "are rarely granted." *United States v. Hedgepeth*, 434 F.3d at 611. "A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory or prejudicial matter." *Alsugair*, 256 F. Supp.2d at 317.

Both of the items that Din identifies as alleged "surplusage" are in fact relevant to the offenses charged in the Indictment. Therefore, the Court need not determine whether they are "prejudicial." *See Hedgepeth*, 434 F.3d at 609 ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included . . . ."); *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) ("[I]f the language in the indictment is information which the government hopes to prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant).") (citation and internal punctuation omitted); *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) ("If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.") (citation and internal punctuation omitted). The United States addresses each of Defendant's motions to strike below.

### 1. The Term "Other" is not Surplusage.

Din cites *United States v. Alsugair*, 256 F. Supp. 2d 306 (D.N.J. 2003), in support of his motion to strike "others" from the Indictment, but *Alsugair* is readily distinguishable.  In *Alsugiar*, the court held that this was "one of those rare cases . . . in which defendant's motion to strike surplusage should be granted," because, aside from the two individuals named in the superseding indictment, the United States referenced "others" multiple times in the indictment but, beyond referencing to a "established criminal enterprise," did not identify any other particular individuals involved in the scheme.  *Id.* at 317. Here, there are indeed other individuals who conspired with the individuals named in the Indictment to violate the Anti-Kickback Statute, including, for example, Tauqir Khan, who was charged in the initial complaint and pled guilty to an Information charging him with participating in the COVID-19 testing conspiracy with Metpath in August 2023.  *See United States v. Tauqir Khan*, Crim. No. 23-692 (BRM), ECF No. 113 (Information charging Khan with, from in or around April 2021 through in or around March 2022, agreeing with Din, Syed, and others to solicit and receive kickbacks in exchange for COVID-19 tests).  The reference to "others" in the Indictment is relevant and should not be stricken.  *See Hedgepeth*, 434 F.3d at 609 ("[I]nformation that is prejudicial, yet relevant to the indictment, must be included . . . .")

## 2. The Term "Kickback" is not Surplusage.

Din also moves to strike from an Indictment *charging conspiracy to violate the Anti-Kickback Statute* the reference to the word "kickbacks" as

prejudicial surplusage.  ECF No. 169 at 32-34.  The allegation that Din and

Syed paid "kickbacks" to marketers in exchange for COVID-19 tests is highly

relevant, and is, of course, the essential theme of the Indictment.  Indeed, the

provision of the Anti-Kickback Statute with which Din has been charged with

conspiring to violate specifically uses the term "kickbacks."  *See* 42 U.S. Code §

1320a–7b(b)(2)(B) ("Whoever knowingly and willfully offers or pays any

remuneration (including any *kickback*, bribe, or rebate) directly or indirectly,

overtly or covertly, in cash or in kind to any person . . . .") (emphasis added). As

discussed above, the United States is not required to tie each and every

kickback payment to a claim submitted to or paid for by a Federal health care

program.  The reference to "kickbacks" is relevant and should not be stricken.

### D. The United States Did Not Abuse the Grand Jury When the United States Issued Subpoenas Regarding Unindicted Individuals.

Citing *In re Grand Jury Proceedings*, 632 F.2d 1033 (3d Cir.1980), Din

argues that the United States abused the grand jury by issuing grand jury

subpoenas to the Phoenix Entities and Mobile Covid Solutions after the

Indictment was returned and moves to suppress all materials obtained by the

grand jury in violation of the grand jury process.  ECF No. 169 at 34-35.  This

motion is entirely unsupported by the facts and the law.  These subpoenas

were served after the Indictment was returned to investigate other individuals

and other crime.  As is made clear in *In re Grand Jury Proceedings*, upon which

Din relies— "a good faith inquiry into *other* charges within the scope of the

grand jury's lawful authority is not prohibited even if it uncovers further

evidence against an indicted person." *Id.* at 1041 (*citing United States v. Dardi*, 330 F.2d 316, 336 (2d Cir. 1964)).  In *In re Grand Jury Proceedings*, because the defendant had "not made any factual showing that the grand jury's sole or dominant purpose for seeking enforcement of the subpoena [was] to continue, unlawfully, to investigate him subsequent to his indictment" and "[b]ecause the grand jury seeks the documents in connection with an investigation *of persons other than Johanson*" the Court concluded that the defendant's indictment was not a bar to enforcement of the subpoena.  *Id.* at 1041-42.  "In the absence of a contrary factual showing, the grand jury proceedings are entitled to a presumption of lawfulness and regularity." *Id.* (citing *In re Grand Jury Proceedings, (Schofield I)*, 486 F.2d 85, 92 (3d Cir. 1973)).

Here, the United States issued subpoena to investigate other individuals and other crimes, not to gather additional evidence against Din for use in the upcoming trial.  The Government will submit a letter to the Court *ex parte* for filing under seal describing the reasons for issuing these subpoenas, including the individuals who were being investigated. Din has made no showing that the "sole and dominant purpose" of the subpoenas were to obtain evidence against him at trial, and Din's request to suppress the Phoenix Entities and Mobile Covid Solutions grand jury subpoena returns should be squarely denied.

**E. The United States Has Complied with and Will Continue to Comply with Its Discovery Obligations With Respect to *Brady*, Rule 16, *Giglio*, Rule 404(b), and Rough Agent Notes, and so Defendants' Motions Should be Denied as Moot.**

    **1. *Brady and Rule 16.***

Din, joined by Syed, requests a Court order requiring the Government to produce all *Brady* and Rule 16 discovery immediately.  ECF No. 169 at 35-38. Aurangzeb requests that the Court order the United States to produce all exculpatory evidence. ECF No. 173 at 18-19. The Government is well aware of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the Government to turn over, at the earliest possible time, any "evidence favorable to an accused . . . material either to guilt or to punishment." *Id.* at 87.  In fact, the Court issued a *Brady* order several years ago in this case.  *See* ECF Nos. 12, 18, 97. Should any exculpatory material come into the Government's possession, it will be disclosed promptly.  No order requiring the Government to meet its obligations is necessary.  The same is true of the Government's obligations to produce Rule 16 discovery.

### 2. *Giglio and Jencks*

Defendant Din seeks early production of *Gigilo* and *Jencks* materials at least 8 weeks in advance of trial.  ECF No. 169 at 38.  Aurangzeb requests immediate disclosure of all *Giglio* and *Jencks* material for all witnesses the government anticipates calling in this case.  ECF No. 173 at 20-22. These requests should be denied.

The Jencks Act, which was adopted to set limits on pretrial discovery of statements in criminal cases, provides that: "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a United States witness . . . shall be the subject of subpoena, discovery, or inspection until said witness has testified on

direct examination in the trial of the case."  18 U.S.C. § 3500(a).  Thus,
disclosure of a government witness's prior statements or reports is not required
until *after* the witness has testified.

The Jencks Act reflects a legislative determination that a criminal
defendant is entitled to use prior statements for impeachment purposes in
cross-examination.  *See Palermo v. United States*, 360 U.S. 343, 349 (1959).
But the Jencks Act is not a discovery vehicle, which is why the Third Circuit
has repeatedly held that a district court cannot compel the government to
disclose statements of its witnesses before the conclusion of the witness's
direct examination. *See United States v. Higgs*, 713 F.2d 39, 44-45 (3d Cir.
1983); *United States v. Scolnick*, 392 F.2d 320, 327 (3d Cir. 1968).

The Government, however, recognizes that "early disclosure to obviate
trial interruptions is encouraged."  *United States v. Bissell*, 954 F. Supp. 841,
871 (D.N.J. 1996) (citing *United States v. Hill*, 976 F.2d 132, 140 (3d Cir.
1992)).  Accordingly, the Government will voluntarily produce *Jencks* material
in accordance with the forthcoming trial scheduling order and at least a week
before trial. This early disclosure will afford defense counsel an adequate
opportunity to prepare for cross-examination without delaying the trial.

The defendants have a reciprocal duty to produce to the Government
prior statements of their witnesses.  Fed. R. Crim. P. 26.2.  In light of the
Government's willingness to produce *Jencks* material a week before trial, the
Government requests that defense counsel reciprocate by providing defense

*Jencks* material at least one week in advance of the testimony of defense witnesses.

The Government is also well aware of its obligation to disclose any *Giglio* information that goes to the credibility of prosecution witnesses. *See Buehl v. Vaughn*, 166 F.3d 163, 181 (3d Cir. 1999). Consistent with these obligations, the Government will disclose any *Giglio* material related to Government witnesses in accordance with the forthcoming trial scheduling order.

### 3. Rule 404(b)

Din requests that the Court order the government to identify all Rule 404(b) material at least 8 weeks in advance of trial. ECF No. 169 at 39. Aurangzeb requests that the United States produce Rule 404(b) material within 30 days before trial. ECF No. 173 at 19-20.

The Government acknowledges its obligation to make pretrial disclosure of Rule 404(b) evidence. The rule itself requires "reasonable notice in advance of trial." Fed. R. Evid. 404(b). Pursuant to District of New Jersey Standing Order No. 15-2 at ¶¶ 17 and 19, the timing of that notice should be set at a final pretrial conference held no sooner than two weeks after the disposition of pretrial motions. Because the parties are presently litigating pretrial motions, disclosure of 404(b) evidence is premature.

Indeed, Din offers no authority or compelling justification to warrant disclosure of Rule 404(b) evidence eight weeks in advance of trial. To the contrary, settled case law makes clear that trial courts routinely authorize such disclosure within days of trial. *See United States v. Blackwell*, 954 F. Supp.

944, 968 (D.N.J. 1997) (denying motion to accelerate the disclosure of Rule

404(b) evidence; disclosure "at least three days before trial . . . [was]

adequate").  *See United States v. Morales*, 280 F. Supp. 2d 262, 274-75

(S.D.N.Y. 2003) (denying a motion for immediate disclosure of Rule 404(b)

evidence and permitting the Government "to provide notice of all Rule 404(b)

material not later than fourteen days before the start of trial"); *see also United*

*States v. Solomonyan*, 451 F. Supp. 2d 626, 646 (S.D.N.Y. 2006) (denying a

motion for immediate disclosure of Rule 404(b) evidence; "[t]he motion is

premature because the government has not yet decided what evidence [it] will

seek to introduce").

Accordingly, Din's request should be denied.  If the Government decides

to offer evidence pursuant to Rule 404(b), it will provide appropriate notice as

ordered by the Court.

### 4. *Rough Agent Notes*

Din asks the Court to order the Government to preserve all agent notes,

including all rough drafts of agent reports. ECF No. at. 169 at 39.  Aurangzeb

moves to compel the United States to preserve and retain all rough notes, draft

reports, and final reports signed by agents.  ECF No. 173 at 24-26. The

prosecutors and law enforcement agents who comprise the prosecution team in

this case are aware of and have complied with their obligations under *United*

*States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983), to preserve notes of

interviews and handwritten drafts and summaries of reports, so the motion

should be dismissed as moot. The prosecutors will review the rough notes to

determine whether they contain any material impeachment information.  The Government is not required to disclose those materials to the defense on demand.  *See United States v. Brown*, 303 F.3d 582, 590 (5th Cir. 2002); *United States v. Muhammad*, 120 F.3d 688, 699 (7th Cir. 1997).  Rather, if directed by the Court, the Government will submit those materials to the Court for *in camera* review and possible disclosure.  *See United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977) (notes should be kept so that the trial court can determine whether they should be made available to the defendant); *accord United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994).

**F.  Din's Motion for Immediate Identification of Experts and Production of Expert Reports Should Be Denied Without Prejudice.**

Din, joined by Syed, moves for an order compelling the Government to "immediately" disclose any experts and produce expert reports and curricula vitae for the experts.  ECF No. 169 at 40.  The Government will disclose the identity of any expert witness well in advance of trial, along with a summary of the witness's testimony and the witness's curriculum vitae, in compliance with Rule 16(a)(1)(G) and in accordance with the forthcoming trial scheduling order.  Din cites no law, and the United States is unaware of any law, that requires the United States to immediately identify any experts or produce expert disclosures at this time.

**G.  Defendants Should Be Permitted to File Additional Motions So Long As They are Based on New Facts or Evidence.**

Din, joined by Syed, and Aurangzeb both seek leave to file additional motions if necessary. ECF No. 169 at 40; ECF No. 173 at 26.  The United

States does not oppose so long as they are based on newly obtained facts or evidence.

### IV.   THE COURT SHOULD DENY SYED'S MOTION TO COMPEL GRAND JURY TRANSCRIPTS AND PURPORTED "BRADY / GIGLIO" RELATED TO UNINDICTED INDIVIDUALS

Syed moves to compel (1) Grand Jury transcripts and (2) purported "Brady and Giglio" material underlying the Government's decision not to include Nisim Davydov, Abdul Rauf, Tauqir Khan, and Tamer Mohamed in the Indictment after including them in the initial complaint.  ECF No. 171.  The motion should be denied.

### A. Syed Fails to Show a Particularized Need for Grand Jury Transcripts.

Syed moves to compel "Grand Jury transcripts," but does not identify which ones he seeks, so the United States presumes he seeks all Grand Jury transcripts in this case.   He argues that he has a "compelling and particularized" need for them because he believes that he is entitled to know why four individuals included in the initial complaint in this case were not named in the Indictment. ECF No. 171 at 11-15.  The complaint in this case included four individuals who were not named in the Indictment: Tamer Mohamed, Tauqir Khan, Abdul Rauf, and Nisim Davydov, so Syed contends that these individuals must have been "exonerated" and, beyond that, that those four defendants' absence from the Indictment is somehow exculpatory *to him*. Syed also argues that he needs the Grand Jury transcripts to "combat developing *Kotteakos* issues unique to conspiracy cases."  *Id.*  He asserts that

the differences between the defendants included in the complaint and in the Indictment reveal that there were multiple conspiracies at play despite the Indictment only describing one such conspiracy.  As a result, Syed argues, he is entitled to review the Grand Jury transcripts in the case.

Syed's arguments are wrong for at least two reasons.  First, the idea that Syed is entitled to Grand Jury transcripts merely because the complaint here charges a different group of conspirators from the subsequent indictment is incorrect and unsupported.  Syed's argument proceeds from the erroneous assumption that some individuals were dropped from the case because they were "exonerated."  That is complete speculation.  The Government could have opted not to indict certain individuals for any number of reasons that have nothing to do with actual innocence, much less reasons that are exculpatory to Syed.  Guessing at the reasons certain defendants were not indicted with Syed does not magically create a "particularized and compelling reason" to obtain Grand Jury transcripts.  Moreover, the Grand Jury played no role whatsoever in the criminal complaint, so it is unclear how Grand Jury transcripts could shed any light on variances between the complaint and Indictment.  Syed cites no on-point authority for his argument here, and the Government has not uncovered any.

Second, Syed contends that the Court should authorize disclosure of Grand Jury transcripts when a defendant raises a *Kotteakos* question, something for which Syed—again—cites no authority.  Nor could he.  *Kotteakos* is fundamentally a question about whether the allegations in the *Indictment*

70

concern a single conspiracy, which here they clearly do.  And, in any event, the question is one that must be resolved at trial because *Kotteakos* concerns whether *trial proofs* vary from the Indictment. The differences between the criminal complaint and Indictment are therefore irrelevant to any *Kotteakos* analysis.  As a result, *Kotteakos* is also clearly not a basis to invade Grand Jury secrecy.

The secrecy of Grand Jury proceedings is protected by Rule 6(e) of the Federal Rules of Criminal Procedure.  Although Rule 6(e)(3)(E) permits a court to authorize disclosure of Grand Jury matters, it may do so only upon a showing of a "particularized need" that outweighs the public interest in Grand Jury secrecy.  In demonstrating particularized need, "mere speculation that improprieties may have occurred will not suffice."  *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir.), *cert. denied*, 409 U.S. 949 (1972).  Instead, discovery of Grand Jury transcripts is appropriate only "upon a showing of [a] substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury."  *Id.*

Syed has failed to satisfy his heavy burden under Fed. R. Crim. P. 6(e). To demonstrate "particularized need," the requesting party "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops N.W.*, 441 U.S. 211, 222 (1979).  Only in "exceedingly rare cases" are defendants "able to make a factually based

71

showing of particularized need for the production and inspection of grand jury materials." *United States v. Naegele*, 474 F. Supp. 2d 9, 10–11 (D.D.C. 2007). Because Grand Jury proceedings carry a "presumption of regularity," *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974), "[m]ere speculation that . . . the Government may have improperly instructed the grand jury . . . falls far short of the showing to overcome the presumption of secrecy." *United States v. Forde*, 740 F. Supp. 2d 406, 414 (S.D.N.Y. 2010). When defendants merely speculate that the Grand Jury was improperly instructed, courts consistently have rejected their requests for disclosure of Grand Jury instructions. *See, e.g., United States v. Singhai*, 876 F. Supp. 2d 82, 99 (D.D.C. 2012); *Forde,* 740 F. Supp. 2d at 414; *United States v. Trie,* 23 F. Supp. 2d 55, 62 (D.D.C. 1998); *United States v. Pike Indus., Inc.,* 575 F. Supp. 885, 891 (D. Vt. 1983).

With respect to Syed's first argument, even if the Grand Jury transcripts had anything to do with the charges in the initial complaint—which they do not—Syed is not entitled to know why the United States charged different people in the complaint and Indictment in this case. *See, e.g., Wayte v. United States*, 470 U.S. 598, 607–08 (1985) (listing "substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute"). Indeed, the Government's decision in that regard is not relevant to the charges against Syed. Syed does nothing more than speculate that the Grand Jury transcripts may shed light on "why the Government believes the complaint conspiracy is no longer criminal conduct," ECF No. 171 at 11. But Syed's rationale incorrectly assumes that the Government dropped certain defendants

from the Indictment because it concluded that those individuals' conduct was no longer criminal.  But the United States could have opted not to indict those individuals for any number of reasons having nothing to do with actual innocence, including, for example, the prosecution's deterrence value, the Government's enforcement priorities, concerns about sufficiency of proof at trial, or that an individual *already entered a guilty plea* (something that in fact happened here).[7] See *Wayte v. United States*, 470 U.S. 598, 607–08 (1985). The reasons Courts typically bar defendants from learning why the Government's decided to charge an individual or not, and the reasons for that decision, are as well-known as they are well-founded: "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.*

Without more, Syed's desire to see Grand Jury transcripts just because different individuals were charged in the complaint and the indictment falls far short of demonstrating a "particularized and compelling reason" to obtain them.  The Court should thus reject his attempt to obtain irrelevant and improper information about the United States's charging decisions in this case.

With respect to Syed's second argument, *Kotteakos* has no applicability here and certainly is not a basis to invade the province of the Grand Jury.  In

---

[7] Tauqir Khan pled guilty to conspiring with Syed and Din to obtain kickbacks for COVID-19 tests in August 2023.  *United States v. Tauqir Khan,* Crim. No. 23-692 (BRM), ECF No. 118 (August 28, 2023).

*Kotteakos*, the government charged a single conspiracy in the indictment but proved—at trial—several separate and distinct conspiracies.  The Supreme Court held that proving multiple conspiracies when only one was charged in the indictment constituted an unlawful variance that prejudiced the defendants. *Kotteakos*, 328 U.S. at 755, 775-56. Accordingly, when considering whether this Indictment suffers from "fatal *Kotteakos* problems," ECF No. 171 at 11, the question before the Court is whether "the *indictment* may be read to allege a single unified scheme[.]" *United States v. Sourlis*, 963 F. Supp. 568, 572 (D.N.J. 1996) (emphasis added) (citation omitted).

Here, the answer to that question is clearly yes. The Indictment alleges a single conspiracy: all four indicted defendants and other co-conspirators allegedly conspired to violate the Anti-Kickback Statute and to profit by either offering and paying kickbacks or soliciting and receiving them in exchange for COVID-19 test samples. *See* Ind. ¶ 3. The Indictment then describes the manner and means the defendants used to carry out the scheme. As with many conspiracies, some of the ways in which the conspirators carried out the scheme involved all defendants and some involved only some. *See* Ind. ¶¶ 4-25; *United States v. Boyd*, 595 F.2d 120, 123-24 (3d Cir. 1978).

Not only does the indictment plainly describe a single conspiracy, but Syed's request for Grand Jury transcripts seeks more information about the conspiracy alleged in the *complaint*.  The complaint has no bearing whatsoever on a *Kotteakos* analysis. *Kotteakos* addresses only whether the *indictment* may be read to allege a single unified scheme. *Sourlis*, 963 F. Supp. at 572. Indeed,

74

each of the cases cited by Syed pertain only to whether a single conspiracy has been charged in the operative *indictment* and proven at trial and have nothing to do with allegations in any initial *complaint. See, e.g.*, ECF No. 171 at 12 (citing *United States v. Barr*, 963 F.2d 641, 648 (3d Cir. 1992) ("We must vacate a conviction if there is a 'variance' between the *indictment* and the proof at trial")) (emphasis added). The allegations in the initial complaint are simply not relevant to whether the Indictment in this case alleges a single scheme. "[A criminal] complaint must not be confused with a civil complaint. A civil complaint initiates a civil suit. Fed. R. Civ. P. 3. A criminal complaint can initiate only a misdemeanor prosecution. Fed. R. Crim. P. 58(b). . . ." *United States v. Richardson*, 780 F.3d 812, 814 (7th Cir. 2015). A criminal complaint "signals an investigation rather than a prosecution." *Id.* (emphasis added); *see also Glass v. United States*, 2017 WL 2799985, at *9 (E.D. Tenn. June 27, 2017) (counsel not ineffective for failing to file motion raising differences between complaint and indictment because "the complaint essentially disappeared upon the filing of the indictment").

On top of all of that, the Third Circuit has also stated repeatedly that "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a *fact question to be decided by a jury.*" *United States v. Perez*, 280 F.3d 318, 345 (3d Cir. 2002) (emphasis added); *accord United States v. Freeman*, 763 F.3d 322, 343 (3d Cir. 2014); *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). It is not a proper subject for a pretrial motion to dismiss, and it certainly is not a justification for seeking Grand Jury materials.

75

The individuals included in the initial complaint in this case therefore have no bearing on whether the Indictment alleges a single conspiracy, and Syed's attempt to argue that rooting out "*Kotteakos* problems" somehow justifies his request for Grand Jury transcripts should be rejected.

**B. Syed's Motion to Compel "Brady and Giglio" related to Charging Decisions Should Be Denied.**

Syed also moves to compel disclosure of so-called "Brady and Giglio" materials related to why Rauf, Davydov, and Mohamed were dismissed from the initial complaint in this case.  ECF 171 at 15-16.  Syed incorrectly argues that evidence that Davydov, Rauf, and Mohamed did not participate in the conspiracy is "necessarily" exculpatory to him.  *Id.*  But he doesn't explain why that is necessarily so.  Indeed, as noted above, there are myriad reasons the Government could have decided to drop a different defendant from a complaint that have nothing to do with Syed's guilt or innocence.  At most, as in every case, Syed is entitled to any material exculpatory evidence, *see Brady v. Maryland*, 373 U.S. 83 (1963), and any material impeachment information, *see Giglio v. United States*, 405 U.S. 150, 154 (1972).  The Government understands those obligations, has complied with them, and will continue to do so.  He is not entitled to more.

Syed is certainly not entitled to discovery about the Government's internal charging decisions about Davydov, Rauf, and Mohamed. The Government retains "broad discretion" about whom to prosecute. *United States v. Goodwin*, 457 U.S. 368, 380, n. 11 (1982). "[S]o long as the prosecutor has

probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the Government's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). As the Supreme Court explained in *Wayte v. United States*, 470 U.S. 598, 607–08 (1985):

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

Syed's claim that he is entitled to discovery about the Government's reasons for not pursuing an Indictment against Rauf, Mohamed, and Davydov are speculative, at best, and call for discovery concerning the United States's prosecutorial charging decisions—information to which Syed is clearly not entitled. As with his other arguments, Syed cites no relevant legal authority for his position, and the Government has not found any, either.

## V.   SYED'S MOTION FOR A *FRANKS* HEARING SHOULD BE DENIED

Syed moves for a *Franks* hearing so the Court can evaluate whether "the omission of any information regarding the Government's drastic change in

theory" between the filing of the April 2022 complaint/search warrant affidavit and the December 2022 indictment "caused the magistrate judge to approve the search warrant where no finding of probable cause would otherwise have been made." ECF No. 170.  Syed's motion should be denied because he has not made a substantial preliminary showing that the affiant omitted *any* facts or contained any inaccuracies and—given the significant information in the affidavit supporting a finding of probable cause—cannot show that any alleged omissions or inaccuracies were material to the finding of probable cause.

The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search warrant or wiretap affidavit.  *U.S. v. Yusuf*, 461 F.3d 374, 383B84 (3d Cir. 2006).  In *Franks v. Delaware*, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. 438 U.S. 154, 155-56 (1978).  "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.*

While *Franks* dealt only with misstatements in an affidavit, Syed also argues that material facts were omitted from the affidavit and the Third Circuit has "applied the Franks test to situations where affiants have omitted

information from the affidavit." *United States v. Frost*, 999 F.2d 737, 743 n.2 (3d Cir. 1993). Omissions and misstatements are material where "probable cause would have been lacking if they had not been made." *Id.* at 509. When information was omitted from an affidavit, the materiality analysis involves "reconstruct[ing] the affidavit, including the recklessly omitted information" and determining whether the warrant as reconstructed provides probable cause for the search. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 474 (3d Cir. 2016).

### A. Syed Has Not Made A Substantial Preliminary Showing That the Affiant Knowingly or Recklessly Included a False Statement In, or Omitted Facts From, The Affidavit.

Syed has not made *any* showing—much less a substantial one—that the affiant who sought a search warrant for Metpath knowingly or recklessly included a false statement in, or omitted facts from, the affidavit. Syed argues only that because the initial complaint included some different individuals than the Indictment in this case, "the proof comes from the Government's own documents" because "[t]he Indictment necessarily contradicts the Affidavit and the complaint." ECF No. 170 at 9-10. But, critically, Syed does not explain why it is "necessarily" contradictory for the Government to charge certain individuals in a complaint and then a different group in an Indictment. Even more to the point, Syed does not say, as he must, what allegations in the search warrant were not true or what omissions rendered it inaccurate. He only speculates about inaccuracies because certain individuals were charged

by complaint and then dropped from it—as if that alone proves that something in the search warrant affidavit were untrue.

But, as he does in his request for Grand Jury transcripts, Syed completely ignores that there are numerous other reasons the Government might choose to drop charges or opt against charging someone that have nothing to do with a "changing theory" or inaccurate information. But Syed's speculation is not nearly enough to raise an issue warranting a *Franks* hearing. *See Yusuf*, 461 F.3d at 383 n.8 (quotation omitted) ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a mere desire to cross-examine, but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.").  He must affirmatively put forth his own proof—typically through sworn affidavits from witnesses—which he has not done here.  That failure alone is fatal to his request for a *Franks* hearing.[8]

---

[8] Although Syed does not identify any misrepresentations in the affidavit, on its own, the United States identified three immaterial errors in the affidavit: Paragraph 15 of the affidavit states that "SYED and DIN also *paid* marketers, including MOHAMED and KHAN, commissions for introducing sources of COVID-19 referrals to SYED and DIN . . . based on the number of tests brought to METPATH by those referral sources." ECF No 170-3 (attaching Search Warrant Affidavit) at ¶ 15 (emphasis added). The affidavit should have said that SYED and DIN *offered* to pay MOHAMED and KHAN commissions, because the United States does not have evidence to show SYED or DIN ever successfully paid MOHAMED or KHAN commissions. This inadvertent error, of course, would have had no impact on a finding of probable cause because the Anti-Kickback Statute prohibits both the offering *or* paying of kickbacks in exchange for referrals.  *See* 42 U.S. Code § 1320a–7b(b)(2)(B) (Whoever knowingly and willfully offers *or* pays any remuneration . . . .) (emphasis added).  Additionally, Rauf was not a medical biller for Metpath, *id.* ¶ 9, and Khan, not Metpath, attempted to use Phoenix

In short, Syed's conclusory and speculative allegations, without setting forth any affirmative proof himself, concerning misrepresentations or omissions in the affidavit do not entitle him to a *Franks* hearing, and his request should be denied.

**B. Even If Syed Had Made A Substantial Preliminary Showing That The Affiant Knowingly Or Recklessly Included A False Statement Or Omitted Facts From The Affidavit, They Were Not Necessary To The Finding Of Probable Cause.**

Even if Syed could satisfy the first prong, he still would not be entitled to a *Franks* hearing because he cannot "demonstrate that the false statement or omitted facts are 'necessary to the finding of probable cause.'" *Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012). Under the second prong of *Franks*, the defendant must prove "that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding." *Yusuf*, 461 F.3d at 383 (citation omitted). "When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the falsehood created by an omission by supplying the omitted information to the original affidavit." *Id.* at 384 (quotation omitted).

It is hard to known even what to excise from the affidavit to undertake such an analysis because Syed has not explained what was incorrect about it or what was left out. In any event, even excising any reference to Mohamed,

---

Business Solutions to disguise bribes from Metpath, *id.* ¶ 30. There are still ample bases to find probable cause in the affidavit without these two facts.

Rauf, or Davdyov, the affidavit demonstrates ample bases to find probable cause.  In the search warrant affidavit, FBI Special Agent Katherine Latrenta lays out in significant detail how:

- Tauqir Khan (who has subsequently pled guilty to conspiring with Syed and Din to violate the Anti-Kickback Statute) introduced CW-1 to Metpath and told CW-1 that he could get $20 - $25 per COVID-19 test he directed to Metpath.  ECF No. 170-3 at 5.

- CW-1 shortly thereafter met with Syed in person at Metpath to negotiate the kickback amount he would earn for every COVID-19 test sample he directed to Metpath.  *Id.* at 5-6.

- CW-1 then began directing COVID-19 tests to Metpath in exchange for kickbacks.  The affidavit describes how CW-1 picked up his kickback checks from Metpath for the COVID-19 test samples he had directed to Metpath in the prior month.  *Id.* at 6.

- The affidavit also includes quotes from recorded meetings that CW-1 made while he was picking up his kickback payments from Metpath and discussing how his kickback payment was calculated.  *Id.* at 6, 9.

This information is more than sufficient to establish probable cause.  It also renders any complaints from Syed about the contents of the affidavit immaterial to the probable cause finding.

In sum, Syed has not demonstrated either "that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit" or

that the "false statement or omitted facts are 'necessary to the finding of probable cause.'" *Pavulak*, 700 F.3d at 665 (quoting *Yusuf*, 461 F.3d at 383-84). Consequently, Syed is not entitled to a *Franks* hearing and his motion should be denied.

## VI.   THE DEFENDANTS SHOULD BE ORDERED TO PRODUCE RECIPROCAL DISCOVERY AND PRIOR DEFENSE WITNESS STATEMENTS.

As set forth in Rule 16(b), upon complying with a request by a defendant for similar material, the Government may "[i]nspect and copy or photograph books, papers, documents, photographs, tangible objects . . . which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at trial." Fed. R. Crim. P. 16(b). Similarly, Rule 26.2 calls for the production of written or recorded statements of any witness a defendant intends to call to testify at trial.

The Government fulfilled its discovery obligations in this case and is entitled to reciprocal discovery. To date, the Government has received no discovery from the defendants. The Government is entitled to this information, and the Court should direct the defendants to immediately produce reciprocal discovery and produce any written or recorded statements of potential witnesses they intend to call at trial at the time of *Jencks* disclosures.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Defendants'

motions in their entirety and grant the Government's motion for reciprocal

discovery and witnesses' prior statements.

Respectfully submitted,

PHILIP R. SELLINGER
 United States Attorney

By:   DENAE M. THOMAS
      JESSICA R. ECKER
      Assistant United States Attorneys

Dated:  July 1, 2024

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that, on this day I caused to be served, via the Court's Electronic Filing System ("ECF"), a copy of the Omnibus Memorandum of Law in Opposition to Defendants' Pre-Trial Motions on all defense counsel of record.

Respectfully submitted,

PHILIP R. SELLINGER
 United States Attorney

By:   DENAE M. THOMAS
JESSICA R. ECKER
Assistant United States Attorneys

Date: July 1, 2024

85